**ABRAMSON & DENENBERG, P.C.**
**BY: ALAN E. DENENBERG, ESQUIRE**
**1200 WALNUT STREET**
**6TH FLOOR**
**PHILADELPHIA, PA 19107**
**(215) 546-1345**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

```
------------------------------------------------------------- x
LUMINENT MORTGAGE CAPITAL, INC.; and   :
MERCURY MORTGAGE FINANCE               :
STATUTORY TRUST,                       :
                                       :
                   Plaintiffs,         :   Civ. A. No.  07-5423
                                       :   ECF CASE
              v.                       :
                                       :   Jury Trial Demanded
                                       :
MERRILL LYNCH & CO., INC.; MERRILL     :
LYNCH, PIERCE, FENNER & SMITH          :
INCORPORATED; MERRILL LYNCH            :
MORTGAGE INVESTORS, INC.; MERRILL      :
LYNCH MORTGAGE LENDING, INC.;          :
MERRILL LYNCH MORTGAGE HOLDINGS,       :
INC.; MERRILL LYNCH MORTGAGE CAPITAL:
INC. and MERRILL LYNCH MORTGAGE        :
INVESTORS TRUST, SERIES 2005-A6,       :
                                       :
                   Defendants.         :
                                       :
------------------------------------------------------------- x
```

## FIRST AMENDED COMPLAINT

Plaintiffs LUMINENT MORTGAGE CAPITAL, INC. and MERCURY MORTGAGE

FINANCE STATUTORY TRUST (collectively, "Luminent" or "Plaintiff"), by and through their

undersigned attorneys, as and for their First Amended Complaint against Defendants MERRILL

LYNCH & CO., INC. ("Merrill Lynch"); MERRILL LYNCH, PIERCE, FENNER & SMITH

INCORPORATED ("MLPFS"); MERRILL LYNCH MORTGAGE INVESTORS, INC.

("Merrill Mortgage"); MERRILL LYNCH MORTGAGE LENDING, INC. ("Merrill Lending");

MERRILL LYNCH MORTGAGE HOLDINGS, INC. ("Merrill Holdings"); MERRILL LYNCH

MORTGAGE CAPITAL INC. ("Merrill Capital") and MERRILL LYNCH MORTGAGE

INVESTORS TRUST, SERIES 2005-A6 ("Merrill Trust," and collectively with Merrill Lynch,

MLPFS, Merrill Mortgage, Merrill Lending, Merrill Holdings and Merrill Capital, herein

"Merrill" or "Defendants"), hereby allege as follows:

<u>**PARTIES**</u>

1.      Plaintiff Luminent is a Maryland corporation having its principal place of

business in Philadelphia, Pennsylvania at One Commerce Square, 2005 Market Street.  Prior to

about December 31, 2007, its principal place of business was at 101 California Street in San

Francisco, California 94111.

2.      Plaintiff Mercury is a Maryland Business Trust that is a subsidiary of Luminent

having its principal place of business in Philadelphia, Pennsylvania at One Commerce Square,

2005 Market Street.  Prior to about December 31, 2007, its principal place of business was at 101

California Street in San Francisco, California 94111.

3.      Upon information and belief, Defendant Merrill Lynch is a Delaware corporation

having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York,

New York 10080.

4.      Upon information and belief, Defendant MLPFS is a Delaware corporation

having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York,

New York 10080.

5.     Upon information and belief, Defendant Merrill Mortgage is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

6.     Upon information and belief, Defendant Merrill Lending is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

7.     Upon information and belief, Defendant Merrill Holdings is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

8.     Upon information and belief, Defendant Merrill Capital is a Delaware corporation having its principal place of business at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

9.     Upon information and belief, Defendant Merrill Trust is a trust fund formed in August 2005 by Merrill Mortgage, whose corpus is located in Minneapolis, Minnesota and held by U.S. Bancorp, successor to Wachovia Bank, National Association as trustee with respect to such assets, and/or by Wells Fargo Bank, N.A. ("Wells Fargo") as the trustee's custodial agent.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1331 and § 1367.  In addition, there is complete diversity of citizenship between the parties, and the amount in controversy is in excess of $75,000, exclusive of interest and costs.  Therefore, the Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

11.     Venue is proper pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, Section 22 of  the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## NATURE OF THE ACTION

12.     This action arises out of Defendants' issuance and sale to Plaintiff of certain subordinate classes of securities known as "Mortgage Loan Asset-Backed Certificates, Series 2005-A6."  Defendants misrepresented, and failed to disclose, material information relating to securities they offered and sold to Plaintiff, entitling Plaintiff to rescission and/or monetary damages.

## COMMON ALLEGATIONS

13.     Luminent and Mercury are real estate investment trusts that purchased the securities that are the subject of this complaint.

14.     Upon information and belief, Merrill Lynch is (and was at all relevant times) a company that, through its subsidiaries, is engaged in the business of, *inter alia*, underwriting and/or issuing securities, and was at all relevant times a controlling person within the meaning of Section 20 of the Securities Exchange Act of 1934 and Section 15 the Securities Act of 1933 with respect to the other Defendants in this action.

15.     Upon information and belief, MLPFS is (and was at all relevant times) a registered broker-dealer engaged in the business of underwriting and/or issuing securities, and a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

16.    Upon information and belief, Merrill Mortgage is (and was at all relevant times) engaged in the business of, *inter alia*, purchasing from lenders residential mortgage loans, and securitizing them, and a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

17.    Upon information and belief, Merrill Lending is (and was at all relevant times) engaged in the business of, *inter alia*, purchasing from lenders residential mortgage loans, and securitizing them, and a subsidiary of Merrill Lynch and Merrill Capital whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

18.    Upon information and belief, Merrill Holdings is (and was at all relevant times) engaged in the business of purchasing residential mortgage loans, and a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch.

19.    Upon information and belief, Merrill Capital is (and was at all relevant times) engaged in the business of purchasing residential mortgage loans, a subsidiary of Merrill Lynch whose voting securities are at least 99% owned (directly or indirectly) by Merrill Lynch, and a controlling person within the meaning of Section 20 of the Securities Exchange Act of 1934 and Section 15 the Securities Act of 1933 with respect to Merrill Lending.

20.    Upon information and belief, Merrill Trust is a trust formed by Merrill Mortgage and an issuer of certain "mortgage loan asset-backed" securities that are the subject of this complaint.

21.    Each of the Defendants was involved in the solicitation and/or sale of the securities that are the subject of this complaint and acted for its own financial benefit, or for the benefit of the actual seller, with respect to those securities.  Alternatively, the information and documents necessary to determine the precise involvement of each defendant is particularly

within the knowledge and/or possession of the Defendants.  In addition, upon information and belief, each of Merrill Lynch, MLPFS, Merrill Mortgage, Merrill Lending, Merrill Holdings and Merrill Capital was at all relevant times a controlling person within the meaning of Section 20 of the Securities Exchange Act of 1934 and Section 15 the Securities Act of 1933 with respect to Merrill Trust.

> **A.      Defendants' Mortgage Backed Certificates.**

22.      In or about August of 2005, Merrill Mortgage caused the formation of Merrill Trust for the purpose of issuing and selling approximately $1 billion of certain mortgage-related securities (or "mortgage pass-through certificates") known as "Mortgage Loan Asset-Backed Certificates, Series 2005-A6" (herein, the "Certificates").

23.      Merrill Trust was formed, and its Certificates were issued, pursuant to a Pooling and Servicing Agreement, dated as of August 1, 2005, among Merrill Mortgage (as "Depositor" of certain mortgage loans), Wachovia Bank, National Association (as trustee), and Wells Fargo (as "Master Servicer and Securities Administrator").

24.      By investing in the Certificates, investors would effectively purchase a beneficial ownership interest in a pool of certain mortgage loans (herein, the "Mortgage Loans") that Merrill Trust acquired and then securitized, and that Merrill Lynch (acting through its underwriting arm, MLPFS) then purchased, as underwriter, and resold to investors.

25.      Merrill Trust acquired the Mortgage Loans via Merrill Mortgage, which acquired them from Merrill Lending.  Merrill Lending acquired approximately 78.26% of the Mortgage Loans from GreenPoint Mortgage Funding Inc. ("GreenPoint"), approximately 18.76% of the Mortgage Loans from Impac Funding Corporation ("Impac"), and approximately 2.98% of the Mortgage Loans from Wells Fargo.  However, the loans from GreenPoint and Impac were

initially acquired by, respectively, Merrill Holdings and Merrill Capital, which then transferred them to Merrill Lending pursuant to two agreements, each an "Assignment, Assumption and Recognition Agreement" dated August 30, 2005.

26.    The issued Certificates consisted of fourteen different classes, three of which were junior in payment priority and/or had a different source of payment as compared to the other 11 classes.   Those three junior classes, the securities primarily at issue in this matter, were designated "Class B-3," "Class C," and "Class P" (herein, collectively, the "Junior Certificates"). (The remaining, more senior, classes were designated "Class I-A-1," "Class I-A-2," "Class II-A-1," "Class II-A-2," "Class II-A-3," "Class II-A-4" (collectively, the "Class A" Certificates"), "Class M-1," "Class M-2," "Class B-1,"  "Class B-2," and "Class R.")

27.    The various classes of Certificates had different levels of seniority, and thus, had different priority among them regarding payment of distributions of monies received on the Mortgage Loans (*i.e.*, the principal and interest paid by the homeowners on the underlying Mortgage Loans), and regarding the allocation among them of losses suffered on the Mortgage Loans.  Distributions to holders of the Certificates resembled a cascade, or "waterfall," in which the most senior Certificates received payments before the next most senior class received payment, and so on.

28.    The general priority among the Certificates was as follows: Classes A and R; M-1; M-2; B-1; B-2 and B-3.  Thus, holders of the Class B-3 were not entitled to receive any amounts received on the Mortgage Loans until the (eleven) more senior holders were paid.

29.    The Class C Certificates were junior to the Class B-3 Certificates.  Moreover, the Class C Certificates represented a "residual" interest in the Mortgage Loans, as the holders of that class of Certificates were entitled to be paid only from the so-called "excess cash-flow"

resulting from that pool of loans.  The "excess cash-flow" was the amount of interest received on the Mortgage Loans that remained after more senior holders were paid the interest owed to them and certain losses (delinquencies and foreclosure losses/shortfalls) are accounted/compensated for.

30.    Investors in the Class P Certificates, on the other hand, were not entitled to any of the interest payment amounts received on the Mortgage Loans, as they (and only they) were instead entitled to receive any "prepayment penalties" incurred by homeowners upon paying off all or a substantial portion of a loan in advance of the expiration of the prepayment penalty term.

31.    The Junior Certificates were issued simultaneously with, and as an integral part of a public offering of, the other Certificates which were publicly offered and issued pursuant to, *inter alia*, a Prospectus and Prospectus Supplement dated August 26, 2005.

**B.    Characteristics of the Mortgage Loans Relevant to Investors in the Junior Certificates.**

32.    Because the Mortgage Loans represented Merrill Trust's sole assets, certain characteristics of those loans were crucial to potential investors.  Furthermore, because the Junior Certificates had lesser priority with respect to payment of distributions and, in the case of the Class C and P holders, a more limited revenue source, those securities represented a concomitantly riskier investment and those material characteristics took on even greater importance for potential investors.

33.    Certain of the characteristics of the Mortgage Loans material to potential investors in the Junior Certificates included the purpose of the Mortgage Loans; the type of properties being mortgaged; the original interest rates owed on the Mortgage Loans; the margin rates earned on the Mortgage Loans; and a Mortgage Loan homeowner's "FICO" score ("Fair Isaac's Credit Risk Score") used in the consumer finance business.

34.     All of these characteristics were material because they were factors predicting the likelihood of a homeowner prepaying, defaulting, or becoming delinquent on mortgage loan obligations, and therefore speak to the value and risks associated with the Mortgage Loans (*i.e.*, the issuer's sole asset).

35.     Furthermore, for potential investors in the Class C and P Certificates, the Mortgage Loans' prepayment penalty terms were material as well.  Prepayment penalties are penalties imposed by a lender on a homeowner when all (or a substantial portion) of the principal owed on the mortgage loan is paid off in advance of the loan's prepayment penalty expiration date.

36.     Those penalties can be of the "hard" or "soft" variety.  In general, so-called "hard" prepayment penalties are penalties imposed by a lender on a homeowner regardless of the reason for the advance payment.  By contrast, "soft" penalty provisions allow the homeowner to avoid a penalty when a prepayment is the result of the homeowner's sale of their property.

37.     As regards the Class P Certificates, the ability and potential for receiving prepayment penalties on the Mortgage Loans was an especially important term in deciding whether to invest, given that prepayment penalties are the only source of a return on an investment for Class P holders.

38.     Moreover, although Class P holders alone were entitled to receive prepayment penalties, the Mortgage Loans' prepayment penalty terms were also important to an investor (like Plaintiff) who considered investing in Class C Certificates as well.  That is because Class C and P Certificates act as a hedge against each other, and are therefore interdependent.

39.     Specifically, because the Class C Certificates represent, in effect, "residual" interests in the excess cash-flow yielded by the Mortgage Loans, the amount of funds received

by Class C holders is sensitive to the amount of prepayments made on the Mortgage Loans.  The greater the prepayment activity, the smaller the pool of the Mortgage Loans remaining and available to generate the excess cash-flow needed to pay Class C holders; the lower the prepayment activity, the more excess cash that is available for them.  Conversely, unlike the holders of Class C Certificates, the holders of Class P Certificates benefit from heavy prepayment activity because they, as the class entitled to prepayment penalties, would be entitled to more cash – provided that prepayment penalties are being incurred and paid by the homeowner.

40.     Thus, for one who invests in both the Class P Certificates and the Class C Certificates, the prepayment penalty revenues gained on the Class P Certificates in the event prepayment activity is high (and penalties are incurred) offset the reduction in the residual cash-flow on the Class C Certificates (and vice-versa in a low prepayment scenario).

41.     As a consequence of the fact that the Class C and P Certificates act as a hedge against each other, if one of these classes prove defective, that necessarily renders the other defective, and undermines the initial decision to purchase all of the Junior Certificates (which were offered as a "3 pack").  Defendants knew this as it is commonly understood in the market that those type of classes of securities act as a hedge against each other.

42.     Even aside from the fact that the Class C and P Certificates act as a hedge against each other, both classes would suffer in the event the pool of Mortgage Loans was heavily weighted towards penalties that are "soft."  In general, if the portfolio of Mortgage Loans has a larger proportion of soft penalties, prepayments on those loans will come in faster than they would if the penalties were of the "hard" variety (because homeowners who are able to prepay without penalty are more likely to do so); there will be fewer penalties to be collected for the

benefit of Class P holders (because "soft" penalties are less likely to result in a penalty than "hard" penalties); and less excess cash-flow for the benefit of the Class C holders (because prepayment reduces the overall amount of interest paid by homeowners on the pool of Mortgage Loans by reducing the number of loans comprising the asset pool).

43.     As a result, in a loan portfolio weighted heavily toward "soft" penalties, an investor (like Plaintiff) in both the Class P and Class C Certificates would simultaneously (i) receive less excess cash on the Class C investment, and (ii) receive less offsetting cash (in the form of prepayment penalties) on the Class P investment.  In other words, for such an investor, the predominance of "soft" penalties on the Mortgage Loans is a losing proposition on both investments, and therefore the need for accurate disclosure concerning the percentage of portfolio loans featuring "soft" prepayment penalties is crucial.

44.     In sum, the difference between "hard" and "soft" prepayment penalties is highly material to a potential purchaser of the Class C and P Certificates, as "soft" penalty terms result in higher risk and less return.

45.     Moreover, the quality of the due diligence examination conducted with respect to the Mortgage Loans by an underwriter and/or issuer of the Certificates is also critical to investors.  That is because the Mortgage Loans represent the issuer's sole assets, and potential investors do not have access to the underlying loan files and other documentation from which it can determine for itself the quality and material characteristics of those assets.  Rather, the potential investor must rely exclusively on the issuer and underwriter for accurate information concerning the characteristics and quality of the underlying Mortgage Loans.

C.     **Defendants' Representations Regarding The Terms of the Mortgage
        Loans.**

46.     In or about July 2005, Keith Tomao, a salesperson in Merrill's San Francisco
office, contacted Trezevant Moore, Plaintiff's CEO, to offer the Junior Certificates as a "3 pack."
Mr. Moore expressed interest in learning more about the Certificates.

47.     Thereafter, Tomao sent Mr. Moore various materials regarding the Certificates by
interstate mail and wire, including but not limited to a term sheet (sent on or about August 20,
2005); a "deal tape" that consisted of an Excel spreadsheet that described important
characteristics of the Mortgage Loans (sent on or about July 26, 2005); a document containing a
matrix that described (on a state-by-state basis) the prepayment penalty terms of the Mortgage
Loans acquired from GreenPoint (the "Prepayment Matrix") (sent on or about July 26, 2005);
and a document authored by Impac Funding Corporation that provided a "detailed explanation"
of the prepayment terms of the Mortgage Loans (the "Impac Detailed Explanation").

48.     Merrill's deal tape listed the approximately 3,200 Mortgage Loans in the pool in
numerical order by "Loan Number" and contained 62 categories of information for each of the
individual loans comprising the pool of Mortgage Loans.  Thus, the deal tape contained literally
tens of thousands of specific factual representations concerning the loans in the pool underlying
the Certificates.

*Representations Regarding Prepayment Penalty Provisions.*

49.     Among the categories of information listed on the deal tape for each loan were
three that related to prepayment penalty terms – one column of data that disclosed the so-called
"Prepayment Penalty Code" for each loan; another that disclosed the "Prepayment Penalty
Months"; and a third that disclosed the state in which the mortgaged property was located.

50.     The "Prepayment Penalty Code" and Prepayment Penalty Months" columns indicated if there was a prepayment penalty associated with a particular mortgage loan, and if so, the number of years or months during which the applicable prepayment penalty would apply to that loan.

51.     In the course of evaluating a potential investment in the Junior Certificates, and for the reasons outlined above, Plaintiff was obviously interested in determining the distribution of hard and soft prepayment penalties amongst the loans in the pool that featured prepayment penalties.

52.     Accordingly, on August 15, 2005, Plaintiff's Assistant Portfolio Manager, Zheng Wang, asked Defendants' Keith Tomao how Plaintiff could derive that information.

53.     In response, on or about August 15, 2005 Defendants' Keith Tomao advised Mr. Wang that the deal tape disclosed which of the loans in the pool featured prepayment penalties, and further disclosed the state of origination of each loan.  Mr. Tomao went on to explain that the Prepayment Matrix showed the types of prepayment penalties permitted by each jurisdiction.  He further represented that all loans on the deal tape featuring prepayment penalties had "hard" penalties, unless the Prepayment Matrix specifically stated that such penalties were not permitted in the jurisdiction where the loan originated.

54.     For example, the Prepayment Matrix indicated that hard prepayment penalties were permissible in California.  Thus, according to Tomao, if the deal tape indicated that a particular loan originated from California and featured a prepayment penalty, Plaintiff could rest assured that the prepayment penalty was of the "hard" variety.

55.     The Prepayment Matrix showed that the vast majority of jurisdictions permitted hard prepayment penalties, as did the Impac Detailed Explanation.  Thus, through the foregoing

representations, as well as the information contained in the deal tape, the Prepayment Matrix, and the Impac Detailed Explanation, Defendants represented to Plaintiff that the Mortgage Loans having prepayment penalties primarily had "hard" prepayment penalties.

*Representations Regarding Other Material Terms of the Mortgage Loans*

56.     In addition to the information regarding prepayment penalties, the deal tape also contained information regarding other material terms of the Mortgage Loans, including the types of properties secured by the Mortgage Loans; the Mortgage Loans' "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans.

57.     As indicated above, these other terms are material to a potential investor because they are factors in trying to predict the likelihood of a homeowner prepaying, defaulting, or becoming delinquent on his/her mortgage loan obligations, and consequently, to determine the value and risks associated with the Mortgage Loans (*i.e.*, the issuer's sole asset).

*Representations Regarding Due Diligence.*

58.     Moreover, prior to Plaintiff's purchase of the Junior Certificates, Mr. Moore had multiple conversations with Tomao regarding the nature and quality of the loans underlying the Certificates, and the level of due diligence performed on the loans.  During those conversations, which occurred in or about August 2005, Tomao represented that the Mortgage Loans were "Alternate-A" (or "Alt-A") loans, which involve prime quality collateral, are well above subprime quality, and are generally made to borrowers with strong FICO credit scores.

59.     On or about August 2005, Tomao further represented to Mr. Moore that Merrill had performed due diligence on the loan portfolio consistent with industry custom, standards, and practice, including a review of a large sample of the documentation underlying the loans,

and a detailed statistical analysis to ensure that the quality of the loans was consistent with the expected yields.

60.     Tomao further represented that Merrill's due diligence had confirmed and had been sufficient to confirm that the representations regarding the Mortgage Loans contained on the deal tape were accurate (prepayment terms, FICO scores, interest rates, property types, etc.); that the Mortgage Loans met the lenders' underwriting criteria; and that the Mortgage Loans were of Alt-A quality.

61.     Moreover, even absent Defendants' explicit representations regarding due diligence, the nature and quality of due diligence performed by underwriters and issuers on the loans underlying mortgage-backed securities was generally understood in the industry. Therefore, Plaintiff would have been entitled to assume that Merrill performed due diligence of that nature and quality unless expressly advised to the contrary by Defendants.

62.     Based on and in reliance upon the myriad representations contained in the deal tape, the term sheet, the Prepayment Matrix and the Impac Detailed Explanation, as well as the representations by Tomao concerning the quality of the loans and the due diligence performed on the loan portfolio, Plaintiff acquired the Junior Certificates on August 30, 2005.

**D.     Plaintiff Discovers Merrill's Misrepresentations.**

63.     In early April of 2007 (between April 1, 2007 and April 13, 2007), Plaintiff received a sampling of approximately 80 loan files from Defendants concerning the Mortgage Loans.  The loan files contained actual documentation underlying the loans in the pool (as opposed to the mere summary information contained in the deal tape provided by Merrill prior to Plaintiff's purchase of the Certificates).

64.     Plaintiff, through Robert Mason, Vice President of Transaction Management, and Leonard Daskus, Assistant Vice President of Credit Analysis, conducted a review of those loan files in April of 2007, and compared the information in them to the information on the deal tape concerning the very same loans.  Plaintiff further compared the information on the deal tape to the information on remittance reports that Plaintiff had received from Wells Fargo on a monthly basis after purchasing the Junior Certificates.  Those remittance reports showed the monthly activity for each of the approximately 3,200 Mortgage Loans in the pool.

65.     Plaintiff's review of the loan files revealed the falsity of the oral and written representations made by Merrill prior to Plaintiff's purchase of the Junior Certificates as aforesaid.

### Misrepresentations Regarding Prepayment Penalty Terms

66.     For example, as noted above, prior to Plaintiff's purchase of the Junior Certificates, the deal tape in conjunction with the Prepayment Matrix had indicated (as per Merrill's explicit representations and interpretation) that the Mortgage Loans in the pool containing prepayment penalty provisions predominantly featured "hard" penalties.

67.     But Plaintiff's comparison of the deal tape with the sampling of loan files revealed the opposite – that the prepayment penalties were predominantly of the "soft" variety. Specifically, the following loans in the sample were found to have "soft" prepayment penalties, despite Merrill's pre-sale representation that those loans featured "hard" prepayment penalty provisions:

| Month/Year | Loan | State | Penalty |
|---|---|---|---|
| July 2006 | 87093316 | CA | 3 YEAR PREPAYMENT PENALTY |
| August 206 | 87120879 | WA | 3 YEAR PREPAYMENT PENALTY |
| August 2006 | 86595329 | CO | 3 YEAR PREPAYMENT PENALTY |
| August 2006 | 86658739 | MI | 3 YEAR PREPAYMENT PENALTY |
| August 2006 | 86805017 | IN | 2 YEAR PREPAYMENT PENALTY |
| September 2006 | 86981453 | FL | 3 YEAR PREPAYMENT PENALTY |
| September 2006 | 87027363 | OR | 3 YEAR PREPAYMENT PENALTY |

| September 2006 | 87092292 | OR | 3 YEAR PREPAYMENT PENALTY |
|---|---|---|---|
| October 2006 | 86218922 | TX | 3 YEAR PREPAYMENT PENALTY |
| October 2006 | 86396447 | NV | 3 YEAR PREPAYMENT PENALTY |
| October 2006 | 86883030 | FL | 3 YEAR PREPAYMENT PENALTY |
| October 2006 | 87090767 | OR | 3 YEAR PREPAYMENT PENALTY |
| November 2006 | 86375045 | CO | 3 YEAR PREPAYMENT PENALTY |
| November 2006 | 86800067 | CA | 3 YEAR PREPAYMENT PENALTY |
| December 2006 | 86868742 | UT | 3 YEAR PREPAYMENT PENALTY |
| December 2006 | 86886777 | CA | 3 YEAR PREPAYMENT PENALTY |
| July 2006 | 86784998 | CA | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86311974 | CA | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86477783 | FL | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86517729 | TX | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86930047 | UT | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86936242 | WA | 3 YEAR PREPAYMENT PENALTY |
| June 2006 | 86938172 | OR | 3 YEAR PREPAYMENT PENALTY |
| September 2005 | 86341534 | AZ | 3 YEAR PREPAYMENT PENALTY |
| September 2005 | 86990363 | FL | 3 YEAR PREPAYMENT PENALTY |
| October 2005 | 86835766 | FL | 3 YEAR PREPAYMENT PENALTY |
| October 2005 | 86943008 | WA | 3 YEAR PREPAYMENT PENALTY |
| November 2005 | 86869187 | CO | 3 YEAR PREPAYMENT PENALTY |
| November 2005 | 87054284 | FL | 3 YEAR PREPAYMENT PENALTY |
| November 2005 | 202401758 | CA | 3 YEAR PREPAYMENT PENALTY |
| December 2005 | 86443488 | CA | 3 YEAR PREPAYMENT PENALTY |
| December 2005 | 86686599 | PA | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86056256 | IN | 2 YEAR PREPAYMENT PENALTY |
| January 2006 | 86263332 | CA | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86465531 | FL | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86891330 | OR | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 86939006 | CA | 3 YEAR PREPAYMENT PENALTY |
| January 2006 | 87051744 | FL | 3 YEAR PREPAYMENT PENALTY |
| February 2006 | 202332250 | KY | 3 YEAR PREPAYMENT PENALTY |
| March 2006 | 86896891 | WA | 3 YEAR PREPAYMENT PENALTY |
| April 2006 | 86125135 | TX | 3 YEAR PREPAYMENT PENALTY |
| April 2006 | 86952009 | UT | 3 YEAR PREPAYMENT PENALTY |
| April 2006 | 700073661 | FL | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86229051 | CA | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86347218 | OR | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86458429 | AZ | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86525938 | AZ | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 86877495 | UT | 3 YEAR PREPAYMENT PENALTY |
| May 2006 | 202219796 | AZ | 3 YEAR PREPAYMENT PENALTY |

68.     As explained above, the difference between "hard" and "soft" prepayment penalties was highly material to Plaintiff as a potential purchaser of the Class C and P Certificates, because "soft" penalty terms result in higher risk and less return.

69.     Moreover, the types of misrepresentations regarding the Mortgage Loans' prepayment terms were not limited to the "hard" versus "soft" issue.  The deal tape Merrill

provided before Plaintiff purchased the Junior Certificates also misrepresented the time period in which a penalty would apply.

70.     For example, the deal tape Merrill provided before Plaintiff acquired the Junior Certificates specified that, for Mortgage Loan number 202400677, the penalty term was three years.  However, the actual loan documentation indicated that the penalty term was merely 12 months.  A shorter prepayment period on a mortgage loan is material to an investor in the Class C and P Certificates as it decreases the likelihood of a prepayment penalty being incurred (which is detrimental to the Class P holder) and increases the likelihood of that loan being paid off early (which is detrimental to the Class C holder).  Other examples include the following Mortgage Loans:

| Month/Year | Loan No. | State | Purported  Penalty Term | Actual  Penalty Term |
|---|---|---|---|---|
| October 2006 | 202390829 | NV | 3 YEAR PREPAYMENT PENALTY | 12 months |
| July 2006 | 202329942 | CA | 3 YEAR PREPAYMENT PENALTY | 12 months |
| July 2006 | 202389417 | NV | 3 YEAR PREPAYMENT PENALTY | 12 months |
| April 2006 | 202133583 | NV | 3 YEAR PREPAYMENT PENALTY | 12 months |

71.     In addition, many loans that Merrill had represented to have prepayment provisions were found to have no prepayment riders at all, as follows:

| Month/Year | Loan No. | State | Purported Penalty | Actual Documented Penalty |
|---|---|---|---|---|
| August 2006 | 87045647 | AZ | 3 YEAR PREPAYMENT PENALTY | No penalty rider |
| November 2006 | 202413076 | NV | 3 YEAR PREPAYMENT PENALTY | No penalty rider |
| March 2006 | 86927688 | VA | 3 YEAR PREPAYMENT PENALTY | No penalty rider |
| May 20006 | 86836079 | DE | 3 YEAR PREPAYMENT PENALTY | No penalty rider |

### *Misrepresentations Regarding Other Material Terms of the Mortgage Loans.*

72.     Worse still, Defendants' misrepresentations regarding the Mortgage Loans were not limited to those assets' prepayment penalty terms.  The deal tape Defendants provided to Plaintiff when pitching the Junior Certificates also contained false and misleading information

regarding various other material characteristics of the Mortgage Loans that Plaintiff relied upon, including: the types of properties secured by the Mortgage Loans; the borrowers' "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans.   For example:

a)      The deal tape Merrill provided before Plaintiff purchased the Junior Certificates represented that, for Mortgage Loan number "700080237," the "property type" was a single family residence, whereas the monthly remittance reports subsequently provided by Wells Fargo indicated that the property was a condominium.  The type of property underlying a mortgage loan was material to investors in the Junior Certificates because owners of certain property types are more likely to default on their payment obligations under a mortgage loan than others (*i.e.*, an owner of a condominium unit is more likely to treat the property as a mere investment, and default, than an owner of a single family residence, who has more incentive to protect their home);

b)      As another example, with respect to the so-called "FICO" rating, the deal tape Merrill provided before Plaintiff purchased the Junior Certificates represented that, for Mortgage Loan number "141517482," the homeowner's score was 627, whereas the monthly remittance reports subsequently provided by Wells Fargo indicates a score of 593.  A homeowner's "FICO" score was material to investors in the Junior Certificates as a lower score increases the likelihood that a payment default will occur with respect to that homeowner's mortgage loan;

c)      Similarly, Defendants' deal tape represented that, for Mortgage Loan number "87053856," the original rate owed on the Mortgage was 6.625%, whereas

the monthly remittance reports provided by Wells Fargo indicated that the original rate was 6.875%.  The interest rate owed on an underlying a mortgage loan is material to investors in the Junior Certificates as higher interest rate terms are more likely to result in a payment default or a refinancing for a lower interest rate;

d)     And, Defendants' deal tape represented that the purpose of Mortgage Loans bearing numbers "86417391," "86810967" and "86966298" was "Refinance Rate-Term" (which means the borrower received better rate/payment terms under the subject loan), while the monthly remittance reports from Wells Fargo indicated that the purpose of those loans was "cashout refinance" (which signifies that a borrower had simply extracted equity, in the form of cash, from the mortgage property).  The purpose of an underlying mortgage loan was material to investors in the Junior Certificates because owners who have refinanced for the purpose of receiving a better interest rate are less likely to default than those who refinanced merely for the purpose of extracting equity (cash) from their property, and the homeowners who did not merely extract equity from the property have more equity remaining in their property available upon foreclosure (or to borrow against to prevent a default and foreclosure); and

e)     Furthermore, with respect to the margin rates relating to the Mortgage Loans, Defendants' deal tape represented that Mortgage Loan number "202127817" had a margin rate of 2.75%, whereas the monthly remittance reports subsequently provided by Wells Fargo disclosed that the margin rate was merely 2.25%.  The margin rate relating to a mortgage loan was material to investors in the Class C Certificates because lower margin rates imply lesser amounts of interest received on

the Mortgage Loans which can become excess cash-flow (for the benefit of Class C holders).

*Misrepresentations Regarding Due Diligence.*

73.     Viewed in retrospect, it is now further clear that Merrill's representations regarding the quality of the loans in the portfolio and the level of due diligence it performed on those loans were also false.

74.     Specifically, in evaluating whether to invest in the Junior Certificates, Plaintiff considered and relied upon standard metrics concerning the underlying loans, such as Loan-to-Value ratios; FICO scores; loan amounts; the purpose of the real property serving as collateral (primary residence, second home, etc.); and the property type (condominium, single family home, etc.).  Plaintiff also relied on Merrill's due diligence on the Mortgage Loans to ensure that those loans actually met the lenders' underwriting criteria (*i.e.*, that the borrower's financial profile actually met the lender's purported minimum standards for extending a mortgage loan) and otherwise satisfied the standard criteria for "Alt-A" quality loans regarding, *inter alia*, the appraisal of the collateral; the amount of assets held by the borrower; the borrower's employment history, income, and debt ratio; and the location of the real property.

75.     The deal tape Merrill provided to Plaintiff before Plaintiff purchased the Junior Certificates contained all of the foregoing information for each of the approximately 3,200 loans in the pool.  It is that information on the deal tape, *inter alia*, that Plaintiff used and relied upon in developing its financial models for predicting the future performance of the loan portfolio, and thus determining whether the Junior Certificates were an advisable investment.

76.     Of course, if the information on the deal tape and other information provided by Defendants was materially inaccurate, Plaintiff's entire calculus regarding the desirability of the Junior Certificates would be rendered inaccurate and useless.

77.     Here, a review of the performance of the loan portfolio over time demonstrates an unusually high rate of early payment defaults, as well as unusually high rates of delinquencies.

78.     In that regard, the default rate has been at approximately 15% of the original aggregate principal amount of the Mortgage Loans – an extraordinarily high rate for loans that are supposed to be "Alt-A" loans.  And, as of November 2007, the delinquency rate stands at approximately 15% of the current aggregate principal amount of the mortgage loans.

79.     Based on Plaintiff's industry knowledge and expertise, those rates are wholly inconsistent with Alt-A quality loans originated during the relevant time period, regardless of current market and economic conditions.

80.     The foregoing facts create the exceptionally strong inference that a substantial portion of the Mortgage Loans did not meet the standard characteristics of "Alt-A" quality loans, and in fact were more akin to subprime loans; that the characteristics of the portfolio as a whole did not comport with the information provided in the deal tape and the term sheet; that, for a substantial portion of the Mortgage Loans, the specific information on the deal tape concerning the material terms of those loans was false; and that (contrary to Merrill's representations) the due diligence performed on the Mortgage Loans was insufficient to confirm that the quality of the loans was consistent with Merrill's representations to Plaintiff prior to Plaintiff's acquisition of the Junior Certificates, or that the information on the deal tape was materially accurate.

81.     In other words, the early payment default and delinquency rates referenced above prove that the material information referenced above in the deal tape had to have been materially

false.  Moreover, that performance is so poor that any competent, industry-accepted level of due diligence on the underlying loans would have detected the inaccuracies.

82.     Indeed, industry custom and practice dictates that issuers and underwriters of mortgage-backed securities take a statistically representative sample of the underlying loan pool, and review the loan documentation for that sample to ensure that the representations made by the borrower to the lender to obtain the loan are accurate (*i.e.*, verify employment, income, liquid assets, appraisal, etc.), and that the lenders' underwriting criteria have actually been satisfied for each of the loans in the sample.

83.     In this case, based on Plaintiff's long experience in the industry and knowledge of industry custom and practice, the due diligence performed by Merrill prior to issuing the Certificates simply could not have met industry standards, nor could it have been in compliance with Merrill's pre-sale representations to Plaintiff.  That non-compliance is proved by the demonstrated inaccuracies uncovered during Plaintiff's sample review of the documents received in April 2007 (referenced above), the inaccuracies revealed by Plaintiff's comparison of information in Defendants' deal tape with the information that appeared in the monthly remittance reports subsequently provided by Wells Fargo, as well as the poor historical performance of the loan portfolio (particularly with respect to early payment defaults and delinquency rates).

84.     In fact, the Class B-3 Certificates have now been put on a "negative watch" by Standard & Poor's – the only rating agency that rates those securities.

85.     Merrill's inadequate diligence efforts regarding the Mortgage Loans is not an aberration.  A December 7, 2007 article in the *New York Times* noted that New York's Attorney

General has issued a subpoenas to certain investment banks, including Merrill, "seeking information about the packaging and selling of subprime mortgages" and noting that,

> Nevertheless, the loans that many banks packaged are proving to be increasingly toxic.  Almost a quarter of the subprime loans that were transformed into securities by Deutsche Bank, Barclays and Morgan Stanley last year are already in default, according to Bloomberg.   About a fifth of the loans backing securities underwritten by Merrill Lynch are in trouble.
>
> Data from another firm that tracks mortgage securities, Lewtan Technologies, shows similar trends. The banks declined to comment on the default rates.
>
> ***The data raises questions about how closely Wall Street banks scrutinized these loans, many of them made at low teaser rates that will reset next year to higher levels***. (emphasis added).

86.     Plaintiff did not discover Defendants' misrepresentations and omissions, and could not have discovered those misrepresentations and omissions, until after receiving the loan file documentation relating to a sample of the Mortgage Loans in April of 2007.  On September 21, 2007, Plaintiff's counsel transmitted a letter to Defendants demanding rescission of the Certificates.

## FIRST CAUSE OF ACTION
### Violation of Sections 10(b) of the Securities and Exchange Act of 1934, Rule 10b-5 Promulgated Thereunder, and Section 20 of the Securities and Exchange Act of 1934

87.     Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 86 as if set forth fully herein.

88.     Each of the Junior Certificates is a "security" within the meaning of the Securities Exchange Act of 1934.

89.     The sale of the Junior Certificates by Defendants to Plaintiff was a "sale" of securities within the meaning of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 77j.

90.     The amount of payments received on, and the resulting value of, the Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

91.     In connection with their offer and sale of the Junior Certificates, Defendants knowingly or, at a bare minimum, recklessly misrepresented the composition of the pool of Mortgage Loans by representing (through the deal tape, the Prepayment Matrix, the Impac Detailed Explanation and Merrill's oral representations regarding those documents as aforesaid) that the Mortgage Loans having prepayment penalties had predominantly "hard" prepayment penalty terms, and by providing false and misleading information regarding various other material characteristics of the individual Mortgage Loans as aforesaid, including but not limited to the terms and existence of prepayment penalties on individual loans; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans.

92.     Defendants also falsely represented that they had conducted adequate due diligence regarding the Mortgage Loans, and concealed and failed to disclose that they had not conducted due diligence on the Mortgage Loans in conformance with that required by standard industry custom and practice.

93.     The following facts pleaded above give rise to a strong inference that Defendants made the foregoing misrepresentations and omissions with scienter:

     a)     Because of their positions as creator of Merrill Trust, acquirer and
     depositor of the Mortgage Loans and issuer and underwriter of the Certificates,
     Defendants, to the exclusion of Plaintiff, had access to full and accurate information
     concerning all of the approximately 3,200 Mortgage Loans in the pool;

b)      Defendants had full and exclusive control over the nature and quality of the due diligence;

c)      The sheer volume and severity of the discrepancies between the deal tape and the approximately 80 sample loans files reviewed by Plaintiff in April 2007, as well as between the deal tape and the monthly remittance reports, establishes that those discrepancies could not have occurred in absence of at least recklessness with respect to the accuracy of Defendants' representations and omissions to Plaintiff; and

d)      The poor historical performance of the Mortgage Loans, particularly in terms of early payment defaults and delinquency rates, establishes that those discrepancies could not have occurred in the absence of at least recklessness with respect to the accuracy of Defendants' representations and omissions to Plaintiff.

94.     Moreover, Defendants had both motive and opportunity to defraud Plaintiff. Issuers of mortgage-backed securities such as Merrill seek to sell subordinated tranches to third-party investors because they are in the business of monetizing their investments in the underlying assets as quickly as possible, and thereby realizing the certainty of a return. Moreover, if Merrill could not sell the Junior Certificates, it would have been compelled to hold those Certificates for their own account. Such a scenario would not only have exposed Merrill to the risk associated with the most subordinate tranches of the Certificates, but also entities such as Merrill have great difficulty booking subordinate mortgage-backed securities due to internal risk management policies and related concerns. For those reasons, Defendants had a motive to defraud and induce Plaintiff into acquiring the Junior Certificates by misrepresenting the nature and quality of the underlying assets, as well as by misrepresenting and concealing the nature and quality of the due diligence they had performed on the Mortgage Loans.

95.     Defendants also had the clear opportunity to defraud Plaintiff in that they had full access to the original documentation underlying the Junior Certificates, and the contractual right to review that documentation to the complete exclusion of Plaintiff.  Therefore, Defendants were able to misrepresent the nature and quality of their due diligence and the underlying loans with impunity.

96.     In sum, Defendants' need to attract and induce investors in the Junior Certificates, and Plaintiff's inability to review for itself the non-public files relating to the Mortgage Loans (and thereby discover Merrill's various misrepresentations regarding the Mortgage Loans and their due diligence), provided the motive and opportunity to defraud Plaintiff.

97.     For the reasons stated above, Defendants' misrepresentations and omissions regarding the Mortgage Loans and their due diligence were material, as no reasonable investor would purchase the "3 pack" of the Junior Certificates had it known the truth about the Mortgage Loans' true characteristics and the truth about Defendants' inadequate due diligence efforts with respect to those assets.

98.     Plaintiff relied on all of Defendants' aforesaid representations and omissions. Moreover, Plaintiff's reliance was justified as it did not have access to the underlying loan documentation prior to acquiring the Junior Certificates, and no right or ability to supervise Defendants' due diligence regarding the Mortgage Loans, and was therefore in no position to uncover Defendants' fraud.

99.     Plaintiff did not discover Defendants' misrepresentations and omissions, and could not have discovered those misrepresentations and omissions, until after receiving the loan file documentation relating to a sample of the Mortgage Loans in April of 2007.

100.    Defendants accomplished their fraudulent conduct by use of the interstate mails and wires.

101.    Defendants' misrepresentations and omissions constitute fraudulent and deceptive activity in connection with the sale of securities.

102.    By virtue of the foregoing, Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) in that Defendants, by the use of means and instrumentalities of interstate commerce, knowingly or recklessly made material misrepresentations and omissions that were false and misleading in light of the circumstances in which they were made, and employed devices schemes and artifices to defraud, and/or engaged in acts and practices and a course of business that operated as a fraud and deceit upon Plaintiff  in connection with their sale of securities.  In addition, under Section 20 of the Securities Exchange Act of 1934, Defendants (other than Merrill Trust) are liable for such violations as controlling persons.

103.    Plaintiff has suffered substantial damages as a result of Defendants' violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and is entitled to rescission and/or damages thereunder.

### SECOND CAUSE OF ACTION
### Violations of Section 12(a)(2) and 15 of the Securities Act of 1933

104.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 103 as if set forth fully herein.

105.    Each of the Junior Certificates is a "security" within the meaning of the Securities Act of 1933.

106.    The amount of payments received on, and the resulting value of, the Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

107.    The Junior Certificates were purchased by Plaintiff from Defendants and were issued simultaneously with, and as an integral part of a public offering of, the other Certificates which were publicly offered and issued pursuant to, *inter alia*, a Prospectus and Prospectus Supplement dated August 26, 2005, and the aforementioned term sheet (which itself constituted a prospectus).  In addition, the deal tape was also written material which, upon information and belief, was circulated to potential investors (including Plaintiff) and constituted a prospectus.

108.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans.

109.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and were made by use of means and/or instruments of transportation; and/or communication in interstate commerce or of the mails; and/or of by means of a prospectus or oral communication.

110.    Plaintiff was not aware of the false and misleading nature of Defendants' representations and omissions when it purchased the Junior Certificates.

111.    Defendants' untrue statements and omissions of material fact in connection with the offer and sale of the Junior Certificates represent violations of Section 12(a)(2) of the Securities Act of 1933.  In addition, under Section 15 of the Securities Act of 1933, Defendants (other than Merrill Trust) are liable for such violations as controlling persons.

112.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has suffered substantial damage and is entitled to rescission and/or damages.  Plaintiff hereby tenders the Junior Certificates to Defendants upon return of the consideration paid plus interest (less any distributions received by Plaintiff while holding such securities).

### THIRD CAUSE OF ACTION
### Fraud/Deceit

113.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 112 as if set forth fully herein.

114.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

115.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans.

116.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations and omitted material facts.

117.    Defendants made their false statements and material omissions knowing that they were false and misleading, and/or with reckless disregard as to whether those statements and omissions were false and misleading, and with the intent of inducing Plaintiff to rely on them and purchase the Junior Certificates.

118.    In deciding to purchase the Junior Certificates, Plaintiff justifiably relied upon Defendants' misrepresentations and was unaware of the omitted material facts; had it known the truth about the Mortgage Loans' prepayment penalty terms and their other material characteristics, and the truth about Defendants' inadequate due diligence efforts with respect to those assets, it would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack").

119.    As a direct and proximate result of Defendants' fraud/deceit, Plaintiff has suffered damages.

## FOURTH CAUSE OF ACTION
### Violation of Pennsylvania Securities Act of 1972

120.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 119 as if set forth fully herein.

121.    Each of the Junior Certificates is a "security" within the meaning of the Pennsylvania Securities Act of 1972.

122.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

123.    Defendants offered and sold the Junior Certificates to Plaintiff in Philadelphia, Pennsylvania – the city and state where Plaintiff had (and still has) operations and where its employees, Trezevant Moore and Zheng Wang, were working at the time of Defendants' offer and sale of the Junior Certificates to Luminent.

124.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented (and/or materially aided or assisted in the misrepresentation) that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made (and/or materially aided or assisted in the making of) various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose (and/or materially aided or assisted in the misrepresentation and failure to disclose) of the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans.

125.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations.

126.    Defendants' offer and sale of the certificates by means of untrue statements of material fact and failure to disclose material facts, with Plaintiff not knowing of the untruths and omitted material facts, represent violations of Section 1-401 and/or 1-403 of the Pennsylvania Securities Act of 1972, which have directly and proximately caused Plaintiff substantial damage for which Defendants are liable to Plaintiff under Sections 1-501 and/or 1-503 of that statute,

entitling Plaintiff to a return of the consideration paid for the Junior Certificates, together with interest at the legal rate from date of payment (less any distributions received by Plaintiff while holding such securities), and/or damages.

127.    Plaintiff did not discover Defendants' misrepresentations and omissions, and could not have discovered those misrepresentations and omissions, until after receiving the loan file documentation relating to the Mortgage Loans in April of 2007.

**FIFTH CAUSE OF ACTION**
**Violation of California Corporate Securities Law of 1968, Sections 25400 and 25401**

128.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 127 as if set forth fully herein.

129.    Each of the Junior Certificates is a "security" within the meaning of the California Corporate Securities Law of 1968.

130.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

131.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented (and/or materially aided or assisted in the misrepresentation) that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made (and/or materially aided or assisted in the making of) various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); and misrepresented and failed to disclose (and/or materially aided or assisted in the misrepresentation

and failure to disclose) the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans..

132.    For the reasons described above, Defendants' representations and omissions were material, false and misleading; Plaintiff was not aware of the false and misleading nature of those representations and omitted material facts; and Defendant knew, and/or had reasonable ground to believe, that their representations and omissions were material, false and misleading.  At a minimum, Defendants were negligent in making those material, false and misleading representations and omissions.

133.    Defendants' initial offer, and their oral and written representations, concerning the Junior Certificates emanated from San Francisco, California, where a Merrill representative (Keith Tomao) was located, and the effects of Defendants' material and false representations were felt in California, where Plaintiff's principal place of business was located prior to about December 31, 2007.

134.    Thus, Defendants' untrue statements of material fact and omissions, and/or materially aiding or assisting in such misrepresentations and omissions, represent violations of Sections 25400 and 25401 of the California Corporate Securities Law of 1968, which has directly and proximately caused Plaintiff substantial damage and entitles Plaintiff to rescission and/or damages under Sections 25500, 25501, 25504 and/or 25504.1 of that statute.

## SIXTH CAUSE OF ACTION
### Violation of California Corporate Securities Law of 1968, Section 25401

135.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 134 as if set forth fully herein.

136.    Each of the Junior Certificates is a "security" within the meaning of the California Corporate Securities Law of 1968.

137.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities.

138.    In addition, the amount of payments received on, and the resulting value of, the Junior Certificates also depend on the rights of holders of such securities, and a critical inducement for Plaintiff's purchase of the "3 pack" of Junior Certificates was Defendants' representations that Plaintiff, as holder of the Class C Certificates, would have so-called "special foreclosure rights" relating to the Mortgage Loans.

139.    In general, special foreclosure rights permit a holder of such rights to, *inter alia*, block foreclosures on defaulted mortgage loans and be actively involved in the mitigation of losses relating to such loans.  More specifically, the holder of such rights is provided the right to receive advance notice of anticipated foreclosure proceedings and to purchase those defaulted mortgage loans before the servicer of such loans commences a foreclosure proceeding. Requesting special foreclosure rights is a standard procedure for Luminent and other REITs that consider purchasing residual interests in a pool of mortgage loans (such as the Class C Certificates), and Plaintiff would not have considered purchasing the Junior Certificates without such rights.

140.    Accordingly, prior to purchasing the Junior Certificates, Trezevant Moore spoke with Keith Tomao and advised him that, absent special foreclosure rights, Plaintiff would not consider purchasing the Junior Certificates.

141.    Defendants agreed and represented that such rights would be provided to Plaintiff, as holder of the Class C Certificates, in the Pooling and Servicing Agreement.  Specifically, Defendants' term sheet represented that:

A Servicer will not commence foreclosure proceedings with respect to a mortgage loan unless (i) no later than five business days prior to such commencement, it notifies the Master Servicer of its intention to do so, and (ii) the majority holder of the Class C Certificates, either directly or through the Master Servicer, does not, within such period, affirmatively object to such action.  If the majority holder of the Class C Certificates timely and affirmatively objects to such action, then it will instruct the Master Servicer to hire three appraisal firms, identified in the related servicing agreements to compute the fair value of the mortgaged property relating to the related mortgage loan utilizing the Fannie Mae Form 2055 Exterior-Only Inspection Residential Appraisal Report (each such appraisal firm computation, a "Fair Value Price"), in each case no later than 30 days from the date of such holder's objection.  The holder of the Class C Certificates will, no later than 5 days after the expiration of such 30-day period, purchase (and deliver to the related Servicer the purchase price for) such mortgage loan and the related mortgaged property at an amount equal to the highest of the three Fair Value Prices determined by such appraisal firms. . .

142.    Furthermore, the term sheet indicated that Plaintiff, as Class C holder, would also have the same "special foreclosure rights" quoted above in the event that a loan's servicer determined not to proceed with a foreclosure, but to take some other action with respect to a loan that was delinquent by 60 days or more.   (The Prospectus Supplement contains the same language regarding the special foreclosure rights of the majority holder of the Class C certificates.)

143.    Defendants' representations that Plaintiff would have "special foreclosure rights" as holder of the Class C Certificates were false.  In fact, no such rights were included for the Class C holder in the Pooling and Servicing Agreement, and/or Plaintiff has not been accorded those rights.

144.    Specifically, although the pool of Mortgage Loans has already suffered approximately 135 foreclosures, Plaintiff has not been provided advance notice of any foreclosure proceedings or otherwise been afforded the opportunity to block a single foreclosure proceeding (and mitigate losses suffered therefrom).

145.    Special foreclosure rights are obviously highly material to a potential investor like Plaintiff who specifically bargains for such rights and for whom such rights were a prerequisite to purchasing any of the Junior Certificates.  They are very important as they enable a holder to, *inter alia*, protect its investment by mitigating losses relating to defaulted losses on the Mortgage Loans.

146.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented (and/or materially aided or assisted in the misrepresentation) that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made (and/or materially aided or assisted in the making of) various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); misrepresented and failed to disclose (and/or materially aided or assisted in the misrepresentation and failure to disclose) the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans; and misrepresented (and/or materially aided or assisted in the misrepresentation) that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

147.    For the reasons described above, Defendants' representations and omissions were material, false and misleading; Defendants intended to induce Plaintiff to rely on them; Plaintiff was not aware of the false and misleading nature of those representations and did rely on them; and Defendants were at a minimum negligent in making those representations and omissions.

148.    Defendants' initial offer, and their oral and written representations, concerning the Junior Certificates emanated from San Francisco, California, where a Merrill representative (Keith Tomao) was located, and the effects of Defendants' material and false representations were felt in California, where Plaintiff's principal place of business was located prior to about December 31, 2007.

149.    Thus, Defendants' untrue statements of material fact and omissions, and/or materially aiding or assisting in such misrepresentations and omissions, represent violations of Section 25401 of the California Corporate Securities Law of 1968, which has directly and proximately caused Plaintiff substantial damage and entitles Plaintiff to rescission and/or damages under Sections 25501, 25504 and/or 25504.1 of that statute.

### SEVENTH CAUSE OF ACTION
### Negligent Misrepresentation

150.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 149 as if set forth fully herein.

151.    The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities, as well as on the existence of special foreclosure rights.

152.    In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); misrepresented

and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans; and misrepresented that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

153.    In connection with their offer and sale of the Junior Certificates, Defendants had a duty to communicate accurate information regarding those securities.

154.    For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations.  Moreover, Defendants ought to have known that its representations were false and they were at least negligent with respect to the accuracy of the foregoing misrepresentations and omissions.

155.    Defendants had no reasonable grounds for believing that the material misstatements it made regarding the nature and characteristics of the Mortgage Loans were true, that its due diligence on the Mortgage Loans was adequate, or that the Class C holders were accorded, or would be accorded, special foreclosure rights.

156.    Defendant intended that Plaintiff rely on its misrepresentations and, in deciding to purchase the Junior Certificates, Plaintiff justifiably did so and was unaware of the omitted material facts; had it known the truth about the Mortgage Loans' prepayment penalty terms and their other material characteristics, and the truth about Defendants' inadequate due diligence efforts with respect to those assets, it would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack").

157.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff has suffered damages.

## EIGHTH CAUSE OF ACTION
### Innocent Misrepresentation

158.   Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 157 as if set forth fully herein.

159.   The amount of payments received on, and the resulting value of, the Junior Certificates depend on the nature and characteristics of the Mortgage Loans underlying those securities, as well as on the existence of special foreclosure rights.

160.   In connection with their offer and sale of the Junior Certificates, Defendants misrepresented that the prepayment penalties associated with the Mortgage Loans had predominantly "hard" prepayment penalty terms; made various misrepresentations regarding other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); misrepresented and failed to disclose the inadequate nature and quality of the due diligence examination they had conducted with respect to the Mortgage Loans; and misrepresented that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

161.   For the reasons described above, Defendants' representations and omissions were material, false and misleading, and Plaintiff was not aware of the false and misleading nature of those representations.

162.   In deciding to purchase the Junior Certificates, Plaintiff justifiably relied upon Defendants' representations and was unaware of the omitted material facts; had it known the truth about the Mortgage Loans' prepayment penalty terms and their other material characteristics, the truth about Defendants' inadequate due diligence efforts with respect to those

assets, and the truth about the lack of special foreclosure rights,  it would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack").

163.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff has suffered damages.

## NINTH CAUSE OF ACTION
### Breach of Contract

164.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 163 as if set forth fully herein.

165.    Plaintiff entered into a purchase agreement with Defendants pursuant to which Defendants agreed that, in exchange for payment of approximately $26,000,000, they would sell and deliver to Plaintiff securities (i) representing a beneficial ownership in a trust whose assets would have certain material characteristics – that is, that they would consist of a pool of approximately 3,200 residential mortgage loans whose prepayment penalties were predominantly "hard" prepayment penalty terms, and which had other characteristics (including those relating to the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans) that would match those represented in the deal tape they had provided to Plaintiff before it decided to invest, and that those mortgage loans would consist of "Alt-A" quality loans that would be subject to an adequate due diligence examination consistent with industry custom, practice, and standards and (ii) which would include a class of certificates – the Class C Certificates – that would have special foreclosure rights.

166.    Defendants breached that agreement by delivering (i) securities that represent a beneficial ownership in a trust that acquired residential mortgage loans whose prepayment

penalty terms are predominantly "soft" prepayment penalty terms; whose terms did not match many of those in the deal tape they had provided; and which were not subjected to a due diligence examination that was adequate and consistent with industry custom, practice, and standards, and (ii) Class C Certificates without the bargained-for special foreclosure rights.

167.   Defendants' breach was substantial and went to the essence of the contract inasmuch as (i) prepayment penalties are the only source of payment on the Class P Certificates, and there will be less prepayment penalties incurred on the Mortgage Loans (and paid to the holders of the Class P Certificates) if those penalties are of the "soft" variety; (ii) the lack of "hard" prepayment penalty terms relating to the Mortgage Loans would also result in more Mortgage Loans being paid off early and, consequently, a reduction in the residual amounts of interest payments available to pay holders of the Class C Certificates; (iii) the other misrepresented characteristics of the mortgage loans substantially impacted the desirability of the Junior Certificates as aforesaid; (iv) the lack of adequate due diligence masked the fact that the Mortgage Loans were of far lesser quality than represented by Defendants; (v) Plaintiff specially bargained for special foreclosure rights for the Class C Certificates and would not have purchased the Junior Certificates absent those rights, particularly since those rights are essential to mitigating potential losses, and (vi) Plaintiff would not have purchased any of the Junior Certificates (which were offered by Defendants as a "3 pack") had it known that the underlying Mortgage Loans would primarily have "soft" prepayment penalty terms and had it known of the misrepresentations regarding the other characteristics of the Mortgage Loans (including the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the

Mortgage Loans); had it known that sufficient due diligence had not been conducted on the underlying loans; or had it known that the Class C Certificates would not have special foreclosure rights.

168.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer damages.

### TENTH CAUSE OF ACTION
#### Rescission

169.    Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 168 as if set forth fully herein.

170.    In connection with their offer and sale of the Junior Certificates, Defendants represented, and thereby caused Plaintiff to believe that, the pool of Mortgage Loans underlying those securities consisted of mortgage loans whose prepayment penalty terms were predominantly "hard" prepayment penalty terms; that those Mortgage Loans had certain other material characteristics (including characteristics regarding the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans); that the Mortgage Loans were subjected to a due diligence examination adequate to confirm the quality of those assets; and that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

171.    In deciding to purchase the Junior Certificates, Plaintiff justifiably relied upon the belief (caused by Defendants' representations and omissions) that the Mortgage Loans consisted of mortgage loans whose prepayment penalty terms were predominantly "hard" prepayment penalty terms; that they would have those other characteristics represented by Defendants

regarding the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings, the original interest rates owed on the Mortgage Loans, the margin relating to the Mortgage Loans, and the purpose of the Mortgage Loans; that Defendants conducted adequate due diligence on the Mortgage Loans consistent with industry custom, practice, and standards; and that Plaintiff would have special foreclosure rights as holder of the Class C Certificates.

172.    Plaintiff did not agree or consent to the purchase of (A) securities from Defendants whose underlying assets were a pool of Mortgage Loans (i) whose prepayment penalty terms were predominantly "soft" prepayment penalty terms; (ii) whose other characteristics (regarding the time period in which a prepayment penalty would apply; the types of properties secured by the Mortgage Loans; the Mortgage Loans' so-called "FICO" ratings; the original interest rates owed on the Mortgage Loans; the margin relating to the Mortgage Loans; and the purpose of the Mortgage Loans) were different from those represented by Defendants; and (iii) that were not subjected to adequate due diligence consistent with industry custom, practice, and standards, or (B)  a "3 pack" of securities which lacked any special foreclosure rights.

173.    Plaintiff's agreement to purchase the "3 pack" of Junior Certificates was therefore the result of a mistake of fact caused by Defendants that went to the essence of the contract.

174.    As a result, Plaintiff is entitled to rescission of the agreement to purchase the Junior Certificates under, *inter alia*, Pennsylvania law and/or California Civil Code, § 1689.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

**RELIEF SOUGHT**

WHEREFORE, Plaintiff demands relief as follows:

(i)      Rescission of the agreement of the purchase and sale of the Junior Certificates;

(ii)     Compensatory damages in an amount to be proved at trial;

(iii)    Punitive damages;

(iv)    Attorney's fees and costs of suit; and

(v)     Such other and further relief as the Court may deem just and appropriate.


Dated:      Philadelphia, Pennsylvania
           January 23, 2008

                                        **ABRAMSON & DENENBERG, P.C.**


                                        **BY:**               **/s/**
                                                    **ALAN E. DENENBERG, ESQUIRE**
                                                    **ATTORNEYS FOR PLAINTIFFS**


                                        *Of counsel:*

                                              Sean F. O'Shea
                                             Michael E. Petrella
                                             **O'SHEA PARTNERS LLP**
                                             90 Park Avenue, 20th Floor
                                           New York, NY 10016
                                           Tel:  (212) 682-4426
                                           Fax:  (212) 682-4437

                                           *Attorneys for Plaintiffs*