IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LUMINENT MORTGAGE CAPITAL, INC., ET AL. | : : : | CIVIL ACTION |
| v. | : : | NO. 07-5423 |
| MERRILL LYNCH & CO., ET AL. | : : | |

**SURRICK, J.**                                                           **AUGUST  20 , 2009**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendants' Motion to Dismiss the Amended Complaint. (Doc. No. 13).  For the following reasons, the Amended Complaint will be dismissed.

**I.      BACKGROUND**

This is a securities fraud action brought by real estate investment trusts (collectively, "Plaintiffs") that purchased mortgage-backed securities in August 2005.  (*See* Am. Compl. ¶¶ 1, 13.)  Plaintiffs purchased the mortgage-backed securities from mortgage banking institutions associated with Merrill Lynch (collectively, "Defendants"), which underwrote and issued the securities.  (*Id.* ¶ 14.)  In general, mortgage-backed securities are long-term debt instruments that represent the income stream from a pool of mortgages.  (*Id.* ¶¶ 24, 27.)  Mortgage banking institutions issue mortgage-backed securities and sell them to investors who receive the income stream from the underlying pool of mortgage loans.  *See generally United States v. York*, 112 F.3d 1218, 1219-20 (D.C. Cir. 1997) (explaining concept of mortgage-backed securities).  In the time since Plaintiffs purchased the mortgage-backed securities from Defendants in August 2005, the mortgage industry and the financing methods that the industry has historically relied upon "have deteriorated significantly and in unprecedented fashion."  (*See* Luminent Mortgage

Capital, Inc., Quarterly Report (Form 10-Q), at 7 (Dec. 27, 2007).)[1]  These "[c]hanged economic conditions," including "dislocations in the sub-prime mortgage sector" and "in the broader mortgage market," have "adversely affected" Plaintiffs' investment portfolio.  (*Id.* at 52.)  There can be no serious dispute that after Plaintiffs purchased the mortgage-backed securities at issue, the mortgage industry and mortgage-backed securities have faced historically unprecedented declines with widespread consequences.  *See generally* Rachel D. Godsil & David V. Simunovich, *Protecting Status:  The Mortgage Crisis, Eminent Domain, and the Ethic of Home Ownership*, 77 Fordham L. Rev. 949, 949-50 (Dec. 2008) (noting that "[t]he link between the mortgage crisis and the full-scale financial meltdown has led to bipartisan support for a degree of government intervention unseen since the Great Depression"); *Helping Families Save Their Homes, The Role of Bankruptcy Law:  Hearing before the Senate Judiciary Committee*, 110th Cong. (Nov. 19, 2008) (testimony of Adam J. Levitin, Professor, Georgetown University Law Center) ("Because most residential mortgages are securitized into widely held securities, unprecedented default rates in the residential mortgage market affect not just mortgage lenders, but capital markets globally.").  In short, "[t]he disruption in the [residential mortgage-backed securities market] is profound."  (*See* Luminent Mortgage Capital, Inc., Quarterly Report (Form 10-Q, at 9 (Mar. 28, 2008).)

Plaintiffs brought this lawsuit alleging that Defendants misrepresented and failed to disclose material information relating to the mortgage-backed securities that Plaintiffs purchased. (*See* Am. Compl. ¶ 14.)  Plaintiffs allege that because of Defendants' misrepresentations, the

---

[1] In securities fraud actions, it is well-established that a court may consider public documents filed with the SEC when deciding a motion to dismiss.  *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (citing cases).

mortgage-backed securities that Plaintiffs purchased carry a higher risk and could offer less

return than they expected.  (*Id.* ¶¶ 44, 77.)

A.      **The Parties**

Plaintiffs are Luminent Mortgage Capital, Inc., a Maryland corporation, and Mercury

Mortgage Finance Statutory Trust, a Maryland business trust.  (*Id.* ¶¶ 1-2.)  Defendants are

Merrill Lynch & Co., Inc. ("Merrill Lynch"), and six Merrill Lynch subsidiaries.  (*Id.* ¶¶ 14-20.)

Defendant Merrill Lynch is a publicly-traded Delaware corporation that underwrites and issues

mortgage-backed securities through its subsidiaries.  (*Id.* ¶ 14.)  Defendant Merrill Lynch, Pierce,

Fenner & Smith, Inc., is a registered broker-dealer and subsidiary of Merrill Lynch that

underwrites and issues mortgage-backed securities.  (*Id.* ¶ 15.)  Defendants Merrill Mortgage

Investors, Inc., and Merrill Lynch Mortgage Lending, Inc., are subsidiaries of Merrill Lynch that

purchase and securitize residential mortgages.  (*Id.* ¶¶ 16-17.)  Defendants Merrill Lynch

Mortgage Holdings, Inc., and Merrill Lynch Mortgage Capital, Inc., are Merrill Lynch

subsidiaries that purchase residential mortgages.  (*Id.* ¶¶ 18-19.)  Defendant Merrill Lynch

Mortgage Investors Trust (the "Issuing Trust") is a trust formed by Merrill Lynch that issued the

mortgage-backed securities that Plaintiffs purchased.  (*Id.* ¶¶ 20, 26.)

B.      **The Mortgage-Backed Securities that Plaintiffs Purchased**

In August 2005, Plaintiffs purchased a class of Mortgage Loan Asset-Backed Certificates,

Series 2005-A6 (the "Certificates"), a type of mortgage-backed security.  (*Id.* ¶¶ 22-23.)

Defendant Issuing Trust issued the Certificates pursuant to a Pooling and Servicing Agreement

and backed the Certificates with nearly $1 billion of underlying mortgage loans.  (*Id.* ¶ 23.)  By

investing in the Certificates, Plaintiffs effectively purchased a beneficial ownership interest in the

3

pool of underlying mortgage loans that Defendant Issuing Trust acquired and securitized and that

Defendant Merrill Lynch then purchased, as underwriter, and resold to investors.  (*Id.* ¶ 24.)

Defendant Issuing Trust issued fourteen classes of the Certificates.  (*Id.* ¶ 26.)  Each class had

different characteristics relating to how and when the holders received payment distributions.

(*Id.* ¶ 27.)  Payment distributions for most of the Certificates resembled a cascade, or "waterfall,"

in which holders of the most senior class of Certificates received payments first, followed by

holders of the next most senior class, and so on until holders of the most junior class of

Certificates received payments.  (*Id.*)

Plaintiffs purchased three classes of Certificates, referred to as the Class B-3, Class C,

and Class P Certificates (collectively, the "Junior Certificates").  (*Id.* ¶¶ 26, 62.)  None of the

Junior Certificates was senior or high priority.  On the contrary, the Class B-3 Certificates that

Plaintiffs purchased were the most junior of all the Certificates and the last in line for payment

distributions.  (*Id.* ¶¶ 26-30.)  Holders of the Class B-3 Certificates were not entitled to payments

received on the mortgage loans until all of the more senior holders were paid.  (*Id.* ¶ 28.)  This

made them riskier investments than the more senior Certificates.  (*Id.* ¶ 32.)  The other two

classes of Certificates that Plaintiffs purchased, the Class C and Class P Certificates, were not in

line for payment distributions at all since they represented a different source of income than the

prioritized Certificates.  The source of income for the Class C Certificates was limited to "excess

cash-flow" resulting from the mortgage loans.  (*Id.* ¶¶ 29, 32.)  "Excess cash-flow" is the amount

of interest received on the mortgage loans that remains after all the more senior holders have

been paid and after certain losses have been taken into account.  (*Id.*)  Thus, the Class C

Certificates represented a residual interest in the pool of mortgage loans.  The source of income

for the Class P Certificates was limited to a pool of "prepayment penalties" that homeowners made on the mortgage loans.  (*Id.* ¶ 30.)  Holders of the Class P Certificates were entitled to receive any prepayment penalties incurred by homeowners upon paying off all or a substantial portion of the mortgage loan in advance of the expiration of the prepayment penalty term.  (*Id.* ¶ 30.)  Like the Class C Certificates, the Class P Certificates were not in line to receive payments made on the underlying mortgage loans.  For all of these reasons, the Junior Certificates as a whole were riskier investments than the higher prioritized Certificates.  (*Id.* ¶ 29.)

### C.    Material Terms of the Junior Certificates

Investors valued the Certificates based on the characteristics of the underlying mortgage loan pool.  Thus, material characteristics of the Class B-3 Certificates included the purpose of the mortgage loans, the type of properties being mortgaged, the original interest rates owed on the mortgage loans, the margin rates earned on the mortgage loans, and the homeowner's FICO score ("Fair Isaac's Credit Risk Score").  (*Id.* ¶ 33.)  These factors were material to the investor because they predicted the likelihood of the homeowner prepaying, defaulting, or becoming delinquent on the mortgage loan, thereby affecting the value and risk of the loan.  (*Id.* ¶ 34.)  In addition to these factors, prepayment penalty terms were material characteristics of the Class C and Class P Certificates.  (*Id.* ¶ 35.)  The Class P Certificates depended on prepayment penalties as the only source of return on investment.  (*Id.* ¶ 37.)  The Class C Certificates likewise depended in part on prepayment penalties since greater prepayment activity and payments to holders of Class P Certificates resulted in a smaller pool of loans remaining to generate excess cash-flow to pay holders of Class C Certificates.  (*Id.* ¶ 38.)  Thus, for one who invested in both the Class C and Class P Certificates, the prepayment penalty revenues gained on the Class P

5

Certificates offset the reduction in the residual cash-flow on the Class C Certificates, and vice-versa. (*Id.* ¶ 40.) In other words, the Class C and Class P Certificates hedged against each other. (*Id.* ¶ 41.)

The Class C and Class P Certificates described prepayment penalties of the "hard" or "soft" variety. (*Id.* ¶ 36.) "Hard" prepayment penalty terms impose penalties on a homeowner regardless of the reason for the advance payment. (*Id.*) "Soft" prepayment penalty terms, on the other hand, allow the homeowner to avoid a penalty when the prepayment is the result of the homeowner's sale of the property. (*Id.*) Payment distributions under the Class C and Class P Certificates could suffer if the underlying mortgage loans were weighted toward "soft" prepayment penalties. This is because "soft" prepayment penalties make it more likely that homeowners who are able to prepay without a penalty do so, which potentially results in smaller payments to holders of the Class C Certificates. (*Id.* ¶ 42.) In addition, "soft" prepayment penalties could mean fewer penalties collected, which potentially results in smaller payments to holders of the Class P Certificates. (*Id.*) A prevalence of "soft" prepayment penalty terms in the underlying mortgage loan pool could result in higher risk and less return to investors in the Class C and Class P Certificates. (*Id.* ¶ 44.)

The quality of the issuer's due diligence examination was another material characteristic of all the Certificates. (*Id.* ¶ 45.) The issuer's due diligence was important because the mortgage loans were the issuer's sole assets and investors did not have access to the underlying loan files and other documentation from which they could independently evaluate the quality of the mortgage loans. (*Id.*)

D.     **Marketing of the Junior Certificates to Plaintiffs**

In July 2005, Defendants' salesperson in San Francisco, Keith Tomao ("Tomao"),
contacted Plaintiff's CEO in Philadelphia, Trezevant Moore ("Moore"), to offer Plaintiff the
Class B-3, Class C, and Class P Certificates as a "3 pack."[2]  (*Id.* ¶¶ 46, 123.)  On or about July
26, 2005, Tomao sent Moore an Excel spreadsheet (a "deal tape") that described characteristics
of the mortgage loans underlying the Certificates.  (*Id.* ¶ 47.)  The deal tape listed the
approximately 3200 mortgage loans in the pool and contained tens of thousands of specific
factual representations concerning the mortgage loans underlying the Certificates, including
where the loans originated and the existence of any prepayment penalties.  (*Id.* ¶ 48.)   Tomao
also sent Moore a prepayment matrix that described on a state-by-state basis the prepayment
penalty terms of 78.26% of the mortgage loans in the pool.  (*Id.* ¶¶ 25, 47.)  Tomao sent Moore a
similar document that provided prepayment penalty information for another 18.76% of the
mortgage loans in the pool.  (*Id.* ¶¶ 47, 53-55.)  In addition, Tamao sent Moore a document that
provided a "detailed explanation" of the prepayment terms of the mortgage loans.  (*Id.* ¶ 47.)  On
or about August 20, 2005, Tomao sent Moore a term sheet.  (*Id.*)

1.     *Tomao's Representations Regarding Prepayment Penalties*

Although the deal tape contained data about the prepayment penalty terms of the
mortgage loans, it did not expressly address the distribution of "hard" and "soft" prepayment
penalty terms.  (*Id.* ¶ 49.)  On August 15, 2005, Tomao advised Plaintiffs' Assistant Portfolio
Manager in Philadelphia, Zheng Wang, that all loans on the deal tape featuring prepayment
penalties had "hard" penalties unless the prepayment matrix specifically stated that such penalties

---

[2] Tomao worked for "Merrill." (Am. Compl. ¶ 46.)  "Merrill" is defined in the Amended
Complaint to include all of the Defendants.  (*Id.* at 2).

were not permitted in the jurisdiction where the loan originated.  (*Id.* ¶¶ 53, 123.)  For example,

if the prepayment matrix indicated that the Commonwealth of Pennsylvania permitted lenders to

impose hard prepayment penalties and the deal tape indicated that a loan originated in

Pennsylvania and featured a prepayment penalty, the prepayment penalty must be of the "hard"

variety.  (*See id.* ¶ 54.)  According to the prepayment matrix, the vast majority of jurisdictions

permitted "hard" prepayment penalties.  (*Id.* ¶ 55.)

2. *Tomao's Representations Regarding Loan Quality and Due Diligence*

In August 2005, before Plaintiffs purchased the Junior Certificates, Tomao told Moore

that the mortgage loans underlying the Certificates were "Alternate-A" loans, which are loans

that involve prime quality collateral and are generally made to borrowers with strong FICO

scores.  (*Id.* ¶ 58.)  Tomao also told Moore that "Merrill" (i.e., all of the Defendants) had

performed due diligence on the loan portfolio consistent with industry custom, standards, and

practice.  (*Id.* ¶ 59.)  As part of its due diligence, Defendant "Merrill" reviewed a large sample of

the loan documentation and conducted a detailed statistical analysis to ensure that the quality of

the loans was consistent with the expected yields.  (*Id.*)  Tomao told Moore that the due diligence

confirmed that the information in the deal tape was accurate, that the mortgage loans met the

underwriting criteria, and that the mortgage loans were of "Alternate-A" quality.  (*Id.* ¶ 60.)

**E. Issuance of the Certificates**

The Issuing Trust issued eleven of the fourteen classes of Certificates to the public

pursuant to a Prospectus and Prospectus Supplement dated August 26, 2005.  (*Id.* ¶ 31; *see

also* Doc. No. 13, Ex. D at 1 (noting that "[the Issuing Trust] will issue fourteen classes of

certificates, eleven of which are offered by this prospectus supplement and the attached

8

prospectus").)  The Issuing Trust did not offer the Junior Certificates to the public.  (*See* Doc.

No. 13, Ex. D at S-71 (noting that the Junior Certificates "are not being offered hereby").)

Rather, the Issuing Trust sold the Junior Certificates in a private offering.[3]  On the front of each

of the Junior Certificates that Plaintiffs purchased, it states in bold capital letters:

> This Certificate has not been and will not be registered under the Securities Act of
> 1933, as amended, or the securities laws of any State and may not be resold or
> transferred unless it is registered pursuant to such Act and laws or is sold or
> transferred in transactions that are exempt from registration under such Act or under
> applicable State law and is transferred in accordance with the provisions of . . . the
> Agreement.

(Doc. No. 13, Ex. 13 at unnumbered 1, 10, 18 (emphasis and capital letters omitted).)  On August

30, 2005, based on the deal tape, term sheet, prepayment matrix, and Tomao's representations to

Moore, Plaintiffs purchased the Junior Certificates as a "3 pack" for $26 million.  (*Id.* ¶¶ 62,

165.)  Plaintiffs do not specify from which of the seven Defendants they purchased the Junior

Certificates.  (*See id.* ¶ 62 ("Plaintiff acquired the Junior Certificates . . .").)

**F.      Post-Purchase Discoveries**

Between April 1 and April 13, 2007, Plaintiff received and reviewed a sampling of

approximately eighty loan files from Defendants concerning the mortgage loans.  (*Id.* ¶ 63.)  The

files contained actual documentation underlying a subset of mortgage loans in contrast to the

---

[3] Plaintiffs do not allege that the Junior Certificates were issued as part of an initial public
offering.  Rather, Plaintiffs allege that "[t]he Junior Certificates were issued simultaneously with,
and as an integral part of a public offering of, the *other Certificates which were publicly offered*
and issued pursuant to, *inter alia*, a Prospectus and Prospectus Supplement dated August, 26,
2005."  (Am. Compl. ¶ 31 (emphasis added)).  Issuance of the Junior Certificates
"simultaneously with" the Certificates that were publicly offered, as alleged, does not mean that
the Junior Certificates were publicly offered.  The express language of the Junior Certificates
provides that the Junior Certificates were "not being offered," and by all accounts the Junior
Certificates were never offered in a public sale.  (*See* Doc. No. 13, Ex. D at S-71.)

summary information contained in the deal tape, which omitted the documentation.  (*Id.*)  The

loan documentation showed that fifty-six of the eighty loans in the sample had "soft" prepayment

penalty terms.  (*Id.* ¶¶ 66-67.)  The deal tape – in conjunction with Tomao's representation –

indicated that these loans had "hard" prepayment penalty terms.  (*Id.*)  The documentation also

showed that five of the eighty loans had shorter prepayment penalty periods than the deal tape

indicated, and that four of the eighty loans had no prepayment penalty terms at all while the deal

tape indicated a three-year prepayment penalty period.  (*Id.* ¶¶ 70-71.)  In addition, there were

five other inconsistencies between the deal tape and the actual loan documentation:  (1) a

condominium was classified on the deal tape as a single family residence; (2) a homeowner with

a 593 FICO score was listed on the deal tape as having a 627 FICO score; (3) a mortgage at

6.875% appeared on the deal tape at 6.625%; (4) a cash-out for home-equity was classified on the

deal tape as a refinancing for a better rate term; and (5) a loan on the deal tape with a 2.75%

margin rate appeared in the documentation to have a 2.25% margin rate, meaning that there

would be less excess cash-flow stemming from the loan for holders of Class C Certificates.  (*Id.*

¶ 70.)

       Plaintiffs allege that the characteristics of the loan portfolio as a whole "did not comport

with the information provided in the deal tape and the term sheet," and as a result, "a review of

the performance of the loan portfolio over time demonstrates an unusually high rate of early

payment defaults, as well as unusually high rates of delinquencies."  (*Id.* ¶¶ 77, 80.)  Plaintiffs

contend that the "performance [of the underlying loans] is so poor that any competent, industry-

accepted level of due diligence on the underlying loans would have detected the inaccuracies."

(*Id.* ¶ 81.)  On September 21, 2007, Plaintiffs demanded rescission of the Junior Certificates.  (*Id.*

¶ 86.)  Defendants refused, and Plaintiffs then initiated this lawsuit.  (*See* Doc. No. 1.)

The Amended Complaint sets forth ten causes of action based on federal and state laws. In Count I, Plaintiffs make a claim under Sections 10(b) and 20 of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated under Section 10(b), alleging that Defendants knowingly or recklessly misrepresented the composition of the pool of mortgage loans underlying the Junior Certificates and falsely represented that Defendants had conducted adequate due diligence.  (Am. Compl. ¶¶ 91-92.)  In Count II, Plaintiffs make a claim under Section 12(2) of the Securities Act of 1933, alleging that the Junior Certificates were "issued simultaneously with, and as an integral part of a public offering," and that Defendants misrepresented the characteristics of the underlying mortgage loans and adequacy of their due diligence.  (*Id.* ¶¶ 107-08.)  In Count III, Plaintiffs make a claim of common law fraud/deceit, alleging that Defendants made false statements and material omissions knowing that they were false and misleading or with reckless disregard as to whether the statements and omissions were false and misleading, and with the intent of inducing Plaintiffs to rely on them.  (*Id.* ¶ 117.)  In Count IV, Plaintiffs make a claim under the Pennsylvania Securities Act of 1972, alleging that Defendants misrepresented the composition of the pool of mortgage loans and falsely represented that they had conducted adequate due diligence in connection with Defendants' offer to sell the Junior Certificates to Plaintiffs in Philadelphia, Pennsylvania.  (*Id.* ¶ 124.)  In Counts V and VI, Plaintiffs make claims under the California Corporate Securities Law of 1968, alleging that Defendants' initial offer and subsequent misrepresentations "emanated from San Francisco, California," and that Plaintiffs' principal place of business was located in California prior to December 31, 2007.  (*Id.* ¶¶ 132-33.)  In Counts VII, VIII, IX, and X, Plaintiffs make common

law claims of negligent misrepresentation, innocent misrepresentation, breach of contract, and rescission, respectively, in connection with the alleged misrepresentations. (*Id.* ¶¶ 152-57, 159-62, 165-68, 170-73.)

## II.    LEGAL STANDARD

Defendants have moved to dismiss the Amended Complaint in its entirety for failure to state a claim.  A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To state a claim upon which relief can be granted, a complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  In other words, a complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.  When assessing whether the complaint satisfies this standard, courts must treat a complaint's allegations as true. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Courts need not accept, however, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 1949; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (noting that courts "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss") (citations and internal quotations omitted).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950.  The court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint. *See City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998); *see also* 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) (noting that in deciding a motion to dismiss under Rule 12(b)(6), "[n]umerous cases . . . have allowed consideration of matters incorporated by reference or

integral to the claim, items subject to judicial notice, matters of public record, . . . items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned") (citations omitted).

Plaintiffs' securities fraud claim must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (noting that plaintiffs alleging fraud under the Exchange Act must comply with the heightened pleading requirements of both Rule 9(b) and the PSLRA); *Clark v. Comcast Corp.*, 582 F. Supp. 2d 692, 703 (E.D. Pa. 2008) (noting same) (citing *In re Rockefeller Ctr. Props., Inc., Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).  Rule 9(b) imposes a heightened pleading standard with respect to factual allegations underlying a claim of fraud.  *See* Fed. R. Civ. P. 9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  *Id.*  The Third Circuit has repeatedly noted that "this particularity requirement has been rigorously applied in securities fraud cases."  *In re Rockefeller Ctr.*, 311 F.3d at 216 (citation omitted).  "At a minimum, to meet the stringent requirements imposed by Rule 9(b), plaintiffs in a securities fraud case must support their allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue.'"  *Clark*, 582 F. Supp. 2d at 703 (quoting *In re Rockefeller Ctr.*, 311 F.3d at 217).

In addition to Rule 9(b), the PSLRA "imposes another layer of factual particularity to allegations of securities fraud."  *In re Rockefeller Ctr.*, 311 F.3d at 217; *see also Cal. Pub. Employee Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (noting that securities fraud

13

plaintiffs "must also comply with the heightened pleading requirements of the PSLRA"); *Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693, 703 (E.D. Pa. 2008) ("The PSLRA heightened the pleading requirements in private securities actions.").  The PSLRA provides that:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1328 (3d Cir. 2002) (noting that securities fraud plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530 (3d Cir. 1999))).  If this particularity requirement is not met, "the court shall . . . dismiss the complaint."  15 U.S.C. § 78u-4(b)(3)(A).  Congress enacted the PSLRA "to remedy the tactic of filing securities complaints to force unwarranted settlements." *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *5 (E.D. Pa. July 27, 2005).  The Third Circuit "has held repeatedly that the intent of Congress was to 'substantially heighten the existing pleading requirements' in securities fraud actions."  *Clark*, 582 F. Supp. 2d at 704 (quoting *In re Rockefeller Ctr.*, 311 F.3d at 217).  In addressing the interplay between Rule 12(b)(6), Rule 9(b), and the PSLRA, the court in *Chubb* explained that

> unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis. . . .  In other words, pursuant to this "modified" Rule 12(b)(6) analysis, "catch-all" or "blanket" assertions that do not comply with the particularity requirements are disregarded.

*Chubb*, 394 F.3d at 145 (internal citations omitted).

Under the PSLRA, a plaintiff alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]."  15 U.S.C. § 78u-4(b)(2).  Scienter is defined as

> a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable conduct, involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*In re IKON Office Solutions, Inc., Sec. Litig.*, 277 F.3d 658, 667 (3d Cir. 2002) (citations and internal quotations omitted).  The strong inference standard "unequivocally raised the bar for pleading scienter.  The inference must be more than merely reasonable or permissible."  *Majer*, 541 F. Supp. 2d at 704.

In 2007, the Supreme Court discussed the pleading standard for scienter in the case of *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-22 (2007).  The court observed that in determining whether scienter has been properly pled, "courts must consider the complaint in its entirety, as well as other sources that courts ordinarily examine when ruling on 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference and matters of which a court may take judicial notice."  *Id.* at 322.  The inquiry is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323.  When determining whether Plaintiffs' allegations give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences."  *Id.*  Recognizing that "the strength of an inference cannot be decided in a vacuum," the Court added that

> the inquiry is inherently comparative: How likely is it that one conclusion, as

15

compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or permissible"– it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 323-24.  Thus, we must consider "competing, plausible inferences of non-culpable intent, and the inference of fraudulent intent must be 'at least as compelling' as these competing inferences."  *Joyce v. Bobcat Oil & Gas, Inc.*, No. 07-1421, 2008 WL 919724, at *8 (M.D. Pa. Apr. 3, 2008) (quoting *Tellabs*, 551 U.S. at 323).  "The Court's *Tellabs* decision removes any doubt that the PSLRA's scienter pleading requirement is a significant bar to litigation . . . ."  *Globis Capital Partners, L.P., v. Stonepath Group, Inc.*, 241 Fed. App'x 832, 836-37 (3d Cir. 2007) (unpublished opinion).

The Third Circuit, interpreting *Tellabs*, recently clarified the scienter pleading requirement in the case of *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009).  In *Avaya*, the court observed that before the *Tellabs* decision, a plaintiff could plead scienter "by alleging facts establishing a motive and opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior."  *Avaya*, 564 F.3d at 276 (citing *In re Advanta*, 180 F.3d at 534-35).  In other words, a showing of motive and opportunity was an independent means of establishing scienter, "one viable even if plaintiffs could not allege facts from which to infer defendants' knowing deceit or recklessness."  *Id.*  "[T]his conclusion is no longer tenable in light of *Tellabs*," the Third Circuit has held, since

"the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.* (quoting *Tellabs*, 551 U.S. at 325). Accordingly, "'motive and opportunity' may no longer serve as an independent route to scienter." *Id.* at 277.

## III.   DISCUSSION

### A.      Subject Matter Jurisdiction

A federal district court must satisfy itself as to its jurisdiction over the subject matter as an important first step to any case. *See Thompson v. United States*, 291 F.2d 67, 68 (10th Cir. 1961) ("It is elementary that the court's first duty is to determine its jurisdiction to entertain and decide a case on its merits."); *Amiriantz v. New Jersey*, No. 06-1743, 2006 WL 3486814, at *2 (D.N.J. Nov. 30, 2006) ("It is well established that a federal court must first determine whether it has subject matter jurisdiction over a case before it can pass on the merits of the case." (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998))), *aff'd*, 251 Fed. App'x 787 (3d Cir. 2007). Plaintiffs assert that subject matter jurisdiction properly lies with this Court because some of their claims arise under federal law, *see* 28 U.S.C. § 1331 (providing for federal question jurisdiction), and also because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, *see* 28 U.S.C. § 1332 (providing for diversity jurisdiction). Here, subject matter jurisdiction is properly grounded on a federal question since Plaintiffs assert claims arising under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and under the Securities Act of 1933, 15 U.S.C. § 77v. *See* 28 U.S.C. § 1331 (providing that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"). Plaintiffs have not alleged sufficient facts, however, for the Court to invoke diversity jurisdiction. *See* 28 U.S.C. § 1332.

17

Plaintiff Mercury and Defendant Merrill Trust appear to be unincorporated business trusts.  (*See* Am. Compl. ¶¶ 2, 9.)  Diversity jurisdiction over an unincorporated business trust depends on the citizenship of its trustees and beneficiaries.  *See Emerald Inv. Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 201 (3d Cir. 2007) (holding that for diversity of citizenship purposes, a court should examine the citizenship of the trustees and beneficiaries to determine the citizenship of the unincorporated business trust).  Plaintiffs allege no facts from which the Court can ascertain the citizenship of the trustees and beneficiaries of Plaintiff Mercury and Defendant Merrill Trust.  (*See* Am. Compl. ¶¶ 2, 9.)  Accordingly, our jurisdiction in this case rests exclusively on Plaintiffs' assertion of federal claims.  *See* 28 U.S.C. § 1331.

### B.       Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

Plaintiffs' first claim arises under Section 10(b) of the Securities Exchange Act of 1934.

Section 10(b) of the Securities Exchange Act provides that it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it "unlawful for any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.[4]  To establish a claim for violation of Rule 10b-5,

---

[4] In its entirety, Rule 10b-5 reads:

18

Plaintiffs must allege: "(1) a material misrepresentation or omission by [Defendants]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC, v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008) (citing *Dura Pharm., Inc., v. Broudo*, 544 U.S. 336, 341-42 (2005)).

In moving to dismiss the Rule 10b-5 claim, Defendants contend that Plaintiffs (1) fail to allege facts that create a strong inference of scienter, (2) fail to allege economic loss, (3) fail to allege loss causation, (4) and fail to plead the claims with particularity against each Defendant.[5]

    *1.*    *Scienter*

Defendants first contend that Plaintiffs do not allege facts that create a strong inference of scienter. Plaintiffs point to paragraphs 93 through 96 of the Amended Complaint, which they

---

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

    [5] We present these arguments in a different order than they appear in Defendants' briefing.

claim "adequately lead to an inference of scienter":

a)      Because of their positions as creator of Merrill Trust, . . . Defendants, to the exclusion of Plaintiff, had access to full and accurate information concerning all of the approximately 3,200 Mortgage Loans in the pool;

b)      Defendants had full and exclusive control over the nature and quality of the due diligence;

c)      The sheer volume and severity of the discrepancies between the deal tape and the approximately 80 sample loan files reviewed by Plaintiff in April 2007, as well as between the deal tape and the monthly remittance reports, establishes that those discrepancies could not have occurred in absence of at least recklessness . . . ; and

d)      The poor historical performance of the Mortgage Loans, particularly in terms of early payment defaults and delinquency rates, establishes that those discrepancies could not have occurred in the absence of at least recklessness.

(Am. Compl. ¶ 93; Doc. No. 23 at 43.)  Plaintiffs further allege that Defendants had a "motive and opportunity to defraud."  (Am. Compl. ¶¶ 94-96.)  Specifically, Plaintiffs allege that

if Merrill could not sell the Junior Certificates, it would have been compelled to hold those Certificates for their own account.  Such a scenario would not only have exposed Merrill to the risk associated with the most subordinate tranches of the Certificates, but also entities such as Merrill have great difficulty booking subordinate mortgage-backed securities due to internal risk management policies and concerns.  For those reasons, Defendants had a motive to defraud and induce Plaintiff into acquiring the Junior Certificates by misrepresenting the nature and quality of the underlying assets, as well as by misrepresenting and concealing the nature and quality of the due diligence they had performed on the Mortgage Loans.

(*Id.* ¶ 94.)  Defendants assert that "an inference of innocent error in inputting information on the deal tape is a far more plausible [explanation] than fraudulent intent because . . . Defendants . . . retained a substantial portion of the economic risk relating to the Junior Certificates."  (Doc. No. 26 at 11.)  Moreover, Defendants assert that their post-purchase conduct undermines any inference of scienter, citing the September 21, 2007 letter that Plaintiffs reference in the Amended Complaint and the Master Repurchase Agreement referenced in the September 21, 2007 letter, which Plaintiffs attach to their response brief.  These documents show that

Defendants purchased the Junior Certificates back from Plaintiffs shortly after Plaintiffs

purchased them.[6]  (*See* Am. Compl. ¶ 83; Doc. No. 13, Ex. B (Letter from Sean F. O'Shea to

John Winchester (Sept. 21, 2007)); Doc. No. 23, Ex. A (Master Repurchase Agreement).)  The

Master Repurchase Agreement clearly states that "the parties intend that all Transactions

hereunder be sales and purchases and not loans . . . ."  (Doc. No. 23, Ex. A at 6.)  Nevertheless,

Plaintiffs characterize the Master Repurchase Agreement as a loan:  "[i]n order to finance the

purchase, [Plaintiffs] entered into the Master Agreement with Defendants whereby [Plaintiffs]

purchased the securities with funds loaned by the Defendants, and transferred those securities to

Defendants as collateral for the loans."  (Doc. No. 23 at 27.)

    In *Tellabs*, the Supreme Court outlined a three-step process for courts to follow when

considering a motion to dismiss based on the scienter element of Section 10(b).  551 U.S. at 322.

First, courts must accept all factual allegations as true, as with any motion to dismiss.  *Id.*

Second, courts must consider the Complaint in its entirety, including documents incorporated

into the Complaint by reference and matters of which courts may take judicial notice, and

examine whether all of the facts alleged taken collectively give rise to a strong inference of

---

    [6] Under Rule 12(b)(6), a court may not consider documents extraneous to the pleadings without treating the motion as one for summary judgment and giving all parties reasonable opportunity to present materials pertinent to such a motion under Rule 56. An exception is made, however, for a "document integral to or explicitly relied upon in the complaint" and it has been long established that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted).  The September 21, 2007 letter referenced in the Amended Complaint and the Master Purchase Agreement are integral to the Amended Complaint.  Plaintiffs allege misrepresentations in connection with their purchase of the Junior Certificates, and these documents speak directly to Plaintiffs' purchase.  In addition, Plaintiffs cite the September 21, 2007 letter in the Amended Complaint.  (*See* Am. Compl. ¶ 83.)

scienter.  *Id.* (citation omitted).  Finally, courts must consider plausible opposing inferences to determine whether the pleaded facts meet the PSLRA's strong inference standard.  *Id.* at 323 (noting that courts must weigh the "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff"); *see also Majer*, 541 F. Supp. 2d at 703 (applying the three-step *Tellabs* process).

Regardless of whether Defendants purchased the Junior Certificates back from Plaintiffs or merely acquired them as collateral, we conclude that the Amended Complaint does not give rise to a strong inference of scienter.  Plaintiffs allege that the discrepancies between the deal tape and actual loan data "could not have occurred in absence of at least recklessness."  However, Plaintiffs do not plead facts to support this contention except by making the observation that there are discrepancies in the loan sample.[7]  Defendants point to the existence of plausible explanations for the discrepancies, e.g., input errors.  Plaintiffs allege no facts that would distinguish Defendants' conduct from simple negligence or that would suggest recklessness or intent to defraud.  Significantly, Defendants at the very least retained the Junior Certificates as collateral on the loan that financed Plaintiffs' purchase.  Defendants therefore retained an interest in the mortgage loans underlying the Junior Certificates.  To find that Defendants acted with scienter in selling securities to Plaintiffs based on the same underlying mortgage loans that

---

[7] Recklessness is defined as "[h]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re RAIT Fin. Trust Sec. Litig.*, No. 07-3148, 2008 WL 5378164, at *12 (E.D. Pa. Dec. 22, 2008) (citing *In re Suprema*, 438 F.3d at 276).  "The standard of recklessness is a demanding one to ensure that 'the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.'"  *Id.* (quoting *Digital Island*, 357 F.3d at 332).

Defendants accepted as collateral would be "to assume that the Defendants intentionally defrauded the Plaintiffs to their own ultimate detriment." *Leder v. Shinfeld*, No. 06-1805, 2008 WL 2165097, at *6 (E.D. Pa. May 22, 2008).  Courts have rejected such an inference, reasoning that "fraud without motive 'makes little economic sense.'" *Id.* (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004)).  We reject such an inference here.  Under all of the circumstances, we fail to see Defendants' "mental state embracing intent to deceive" or "highly unreasonable conduct . . . that is either known to [Defendants] or is so obvious that the actor must have been aware of it." *In re IKON*, 277 F.3d at 667.

Plaintiffs maintain that they have "sufficiently alleged Defendants' fraudulent intent, showing that Defendants had motive (dumping their low quality loans) and opportunity (by having exclusive access to the actual loan information, allowing Defendants to communicate false information to Luminent)."  (Doc. No. 23 at 33; *see also* Compl. ¶ 94 ("Defendants had both motive and opportunity to defraud Plaintiff.").)  The Third Circuit has made it clear in the wake of the Supreme Court's decision in *Tellabs* that plaintiffs must do more than show motive and opportunity to prove scienter.  *See Avaya*, 564 F.3d at 276 (holding that "'motive and opportunity' may no longer serve as an independent route to scienter" (quoting *Tellabs*, 127 S.Ct. at 2511)).  Accordingly, whether Defendants' acted with scienter cannot be shown through motive and opportunity alone.  Plaintiffs' allegations of motive and opportunity, considered with the rest of the allegations in the Amended Complaint as a whole, fail to plead with particularity facts that give rise to a strong inference of scienter.  *See Tellabs*, 551 U.S. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."); *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 608 (E.D. Pa. 2009) (noting that "a plaintiff's

inference that a defendant's alleged actions are reckless or intentional must be compared to any

nonculpable inference offered by the defendant, and must be cogent and at least as compelling as

any such nonculpable inference in order for the complaint to give rise to a strong inference of

scienter").  Plaintiffs' Section 10(b) claim must therefore be dismissed for failure to plead

scienter.

2.    *Economic Loss*

Defendants next contend that Plaintiffs fail to allege economic loss since Plaintiffs no

longer own the securities and Plaintiffs do not allege that they sold the securities for a loss.

(Doc. No. 13 at 16-17.)  Defendants point to the September 21, 2007 letter, which states that

Plaintiffs sold the securities back to Defendants "pursuant to a Master Repurchase Agreement."

(*See* Doc. No. 13, Ex. B at 1.)  Plaintiffs respond that the prevalence of "soft" prepayment

penalty terms and mortgage loans that are not of "Alternate-A" quality, as alleged in the

Amended Complaint, is sufficient to plead economic loss since these characteristics "result[ed]

in higher risk and less return for Luminent."  (Doc. No. 23 at 26; Am. Compl. ¶ 44.)  Plaintiffs

further respond that "regardless of whether Luminent actually 'owns' the Junior Certificates, any

revenue produced by the securities goes to Luminent, not to Defendants," pursuant to the Master

Repurchase Agreement.  (Doc. No. 23 at 11.)

There appears to be no dispute that Plaintiffs received the payments due under the Junior

Certificates independent of who owns the Junior Certificates.  It is irrelevant for purposes of

economic loss that Plaintiffs no longer "own" the securities in a technical sense if Plaintiffs

retain the right to receive the income stream from the securities and that income stream is

diminished.  According to Plaintiffs' response brief, "Luminent has alleged that . . . income

streams are lower than they should be, because of Defendants' misrepresentations about 'hard'

versus 'soft' prepayment penalties [and] because the loans are defaulting at a higher rate than

they would be if Defendants had not misrepresented the quality of the loans." (Doc. No. 23 at

28.) Nowhere in the Amended Complaint do Plaintiffs allege, however, that "soft" prepayment

penalties or the "extraordinarily high" default rate on the underlying mortgage loans actually

caused Plaintiffs a loss. The Amended Complaint is silent as to what the magnitude of the loss

might be. The argument that Plaintiffs make in their response brief does not correspond to the

allegations in the Amended Complaint.

The Amended Complaint is also silent as to how the loss can be distinguished from the

market-wide losses in mortgage-backed securities generally.[8] The Amended Complaint is

worded as a hypothetical, leaving Defendants and the Court to assume that the problematic

characteristics of mortgage loans described by Plaintiffs actually operated to cause Plaintiffs to

lose income on the Junior Certificates. (*See* Am. Compl. ¶ 44 (alleging that "'soft' penalty terms

[in general] result in higher risk and less return," but not alleging that "soft" penalty terms in the

mortgage pool underlying the Junior Certificates actually resulted in less income to Plaintiffs).)

---

[8] Defendants observe that Plaintiffs "miss[]the point" by stating that they "can and will submit affidavits demonstrating that specific loans Defendants represented as featuring 'hard' prepayment penalties actually featured 'soft' prepayment penalties, and that those loans actually defaulted." (Doc. No. 23 at 37.) We agree. Of the 57 mortgages with alleged misrepresentations concerning prepayment terms, Plaintiffs do not allege that any of these mortgages would have resulted in a prepayment penalty that Plaintiffs would have been entitled to receive. In fact, assuming that the 57 mortgages "actually defaulted" as Plaintiffs allege, it would be irrelevant that Defendants misrepresented the prepayment penalties on these loans since a failure to repay the loan "is the exact opposite of an early payment of the loan." (Doc. No. 26 at 8.) In such a case, Plaintiffs would have suffered no economic loss from Defendants' misrepresentation of the prepayment penalty terms of these 57 loans since the loans defaulted and no prepayment was made.

Defendants correctly assert that Plaintiffs "describe losses that a holder of the Junior Certificates *might* suffer if the pool of mortgage loans had a large proportion of 'soft' penalties (*see* Am. Compl. ¶¶ 42-44), but [do] not describe the losses that Luminent actually *did* suffer." (Doc. No. 13 at 19.) Even the four paragraphs of the Amended Complaint on which Plaintiffs rely as examples of economic loss are phrased in the conditional tense or in generalized terms: "returns on the Junior Certificates *would* suffer. . ." (Am. Compl. ¶ 42) (emphasis added); "the predominance of 'soft' penalties . . . is a losing proposition" (*id.* ¶ 43); "soft penalty terms result in . . . less return" (*id.* ¶ 44); "Luminent *would* receive less cash. . ." (*id.* ¶ 43) (emphasis added). Plaintiffs must allege more than just a tendency to cause economic loss. Plaintiffs must allege an economic loss. *See Dura Pharm.*, 544 U.S. at 347 (finding general allegation of damages insufficient and noting that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind"). Plaintiffs' reliance on vague and boilerplate invocations of economic loss is similarly unavailing.[9] (*See* Am. Compl. ¶¶ 103, 112, 119, 157, 163, 168 (stating generally that Plaintiffs have "suffered damages").) Therefore, the Amended Complaint must be dismissed for failure to allege an economic loss. *See, e.g.*, *Reding v. Goldman Sachs & Co.*, 382

---

[9] Plaintiffs also allege that Defendants agreed to provide "special foreclosure rights" that would allow "the majority holder of the Class C Certificates" to receive advance notice of anticipated foreclosure proceedings and to purchase the defaulted mortgage loans before the loan servicer commenced the foreclosure proceeding. (*See* Am. Compl. ¶¶ 138-44.) Plaintiffs concede that they are not the majority holder of the Class C Certificates since they sold them four days later pursuant to a repurchase agreement with Defendants. (*See* Doc. No. 13 at 45.) While the Master Purchase Agreement appears to grant Plaintiffs a right to the income streams associated with the Junior Certificates, as discussed above, Defendants correctly point out – and Plaintiffs do not dispute – that there is no provision that grants Plaintiffs ongoing "special foreclosure rights." (*See* Doc. No. 26 at 27.) Plaintiffs therefore do not state an injury with respect to any such rights.

F. Supp. 2d 1112, 1119 (E.D. Mo. 2005) (dismissing complaint where allegations of damages from securities fraud were too "vague" to plead actual losses).

### 3.  Loss Causation

Next, assuming *arguendo* that Plaintiffs plead an economic loss, Defendants contend that Plaintiffs failed to plead loss causation.  "Loss causation" refers to "a causal connection between the material representation and the loss."  *Dura Pharm.*, 544 U.S. at 342.  The Amended Complaint must provide Defendants "with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation."  *Id.* at 347. Defendants assert that Plaintiffs' losses "are not the result of 'fraud' but stem from the unexpected collapse of the real estate and mortgage markets, which has caused all mortgage-backed securities to suffer dramatic losses."  (Doc. No. 26 at 1; *see also* Doc. No. 13 at 20.) Plaintiffs respond that the market dislocation occurred in August 2007, months after Plaintiffs "noticed irregularities" in the pool of mortgage loans, thus undermining any inference that the market dislocation is to blame.  (*See* Doc. No. 23 at 35.)

Defendants cite several cases for the proposition that Plaintiffs' claims fail since market events, and not Defendants' alleged misrepresentations, caused the losses.  *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994).  The Second Circuit's decision in *Gelt* is instructive.  In *Gelt*, the plaintiff brought an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging that the defendants misrepresented the value of properties pledged as collateral to secure loans and thereby fraudulently induced the plaintiff to make loans it otherwise would not have made.  *Gelt*, 27 F.3d at 765.  The alleged injury occurred five years after the

alleged misrepresentation.  *Id.* at 771.  During this five-year period, the real estate market

collapsed.  *Id.*  The court found that the complaint failed to plead proximate causation because

the plaintiff's alleged injury was insufficiently close in time to the alleged misrepresentations to

warrant the inference of a nexus between the two.  *Id.* at 772.  The court noted that

> [w]hen a significant period of time has elapsed between the defendant's actions and
> the plaintiff's injury, there is a greater likelihood that the loss is attributable to events
> occurring in the interim.  Similarly, when the plaintiff's loss coincides with a market-
> wide phenomenon causing comparable losses to other investors, the prospect that the
> plaintiff's loss was caused by the fraud decreases.

*Id.* (citing *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990)).

   *Lentell* is similarly instructive.  In *Lentell*, the plaintiffs were a putative class of

purchasers of shares in certain Internet-related companies during the waning phase of the

technology stock boom.  *See* 396 F.3d at 164.  The defendants, which included Merrill Lynch,

were publishers of reports recommending the purchase of shares in certain Internet companies.

*Id.*  The reports purported to reflect analysts' opinions on these investments.  *Id.*  The plaintiffs

claimed, *inter alia*, that Merrill Lynch issued "false and misleading reports recommending that

investors purchase shares" in these Internet ventures in order to cultivate the firm's

investment-banking clients.  *Id.*  The Court of Appeals for the Second Circuit affirmed dismissal

"on the ground that the complaints fail[ed] to plead that the alleged misrepresentations and

omissions caused the claimed losses."  *Id.*  Like the court in *Gelt*, the court in *Lentell* concluded

that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable

losses to other investors," – i.e., the stock market bust – "the prospect that the plaintiff's loss was

caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately [pled] facts

which, if proven, would show that its loss was caused by the alleged misstatements as opposed to

intervening events." *Id.* at 174 (citing *Gelt*, 27 F.3d at 772).

We are satisfied that the one-and-a-half year time period between the alleged

misrepresentation and the injury,[10] combined with the market downturn in the mortgage industry

that developed in early- to mid-2007, is sufficient to undermine the inference of a nexus between

Defendants' misrepresentations and the performance of the Junior Certificates. *See Gelt*, 27 F.3d

at 765. Plaintiffs contend that they noticed irregularities in the mortgage pool "in early 2007."

This was just months before Plaintiffs publicly announced the "unprecedented" deterioration in

market conditions. Plaintiffs purchased the Junior Certificates nearly one-and-a-half years prior

to these events. Plaintiffs allege no facts to support their assertion that Defendants'

misrepresentations in 2005 – rather than the market dislocation that occurred in 2007 – caused an

economic loss. *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 431 (3d Cir. 2007) ("In order

to satisfy the loss causation requirement . . . in § 10(b) actions, the plaintiff must show that the

defendants misrepresented or omitted the very facts that were a substantial factor in causing the

plaintiff's economic loss."); *Marsden v. Select Med. Corp.*, No. 04-4020, 2007 WL 518556, at *2

(E.D. Pa. Feb. 12, 2007) (citing *Emergent Capital Inv. Mgmt., LLC, v. Stonepath Group, Inc.*,

343 F.3d 189, 198-99 (2d Cir. 2003) ("A plaintiff therefore shows loss causation by alleging and

ultimately proving that the defendant's fraud caused her to suffer actual economic loss.")).

Moreover, Plaintiffs do not dispute that the real estate and mortgage financing markets

have undergone a substantial dislocation since Plaintiffs purchased the mortgage backed

securities in August 2005. On August 6, 2007, Plaintiffs "announced [that] the mortgage

---

[10] It is not clear from the Amended Complaint when Plaintiffs' alleged injury occurred. Nevertheless, we assume that since Plaintiffs "noticed irregularities" in the mortgage pool in early 2007, the alleged injury occurred at about that time. (*See* Doc. No. 23 at 35.)

industry and the financing methods that the industry has historically relied upon have deteriorated significantly and in unprecedented fashion." (*See* Luminent Mortgage Capital, Inc., Quarterly Report (Form 10-Q), at 7 (Dec. 27, 2007).)  Plaintiffs stated that the market dislocation has affected "the broader mortgage market" (*id.* at 52), and caused all "[m]ortgage-backed securities [to] have experienced significant declines in market value in the second half of 2007" (Doc. No. 26, Ex. H at 6).  Indeed, the turmoil in the markets is widely known.  *See, e.g.*, *In re MoneyGram Int'l, Inc., Sec. Litig.*, No. 08-0883, 2009 WL 1451582, at *3 (D. Minn. May 20, 2009) (describing deterioration in the housing and mortgage industry that began in 2007: "[s]ales of existing homes dropped, housing prices fell, the subprime mortgage industry collapsed and mortgage defaults and foreclosures surged").  Plaintiffs make no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the "significant declines in market value" for mortgage-backed securities.  *See Glover*, 2006 WL 2850448, at *37 n.67 (noting that "the burden is on the plaintiff to plead that its loss was caused by fraud and not intervening events" and dismissing complaint since it "contains no allegations which allow the Court to apportion Plaintiff's losses between the concealed and disclosed portions of the risk that materialized – in fact, even the magnitude of the loss is unclear").[11]  For all of these reasons, the Amended Complaint must be dismissed for failure to plead loss causation.[12]

_____

[11] Plaintiffs also allege that they would not have purchased the Junior Certificates but for Defendants' misrepresentations.  (*See* Am. Compl. ¶ 62.)  This allegation relates to transaction causation – i.e., but for the misrepresentation, the investor would not have purchased or sold the security – but not to loss causation.  A plaintiff must allege both transaction causation and loss causation.  *See McCabe*, 494 F.3d at 425.

[12] It is "normally inappropriate to rule on loss causation at the pleading stage," *In re Gilead Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008), since "loss causation becomes most critical at the proof stage," *McCabe*, 494 F.3d at 427 n.4.  Plaintiffs' burden here is low.

4.      *Requisite Particularity*

Finally, Defendants contend that Plaintiffs fail to plead the conduct of each Defendant with particularity since the Amended Complaint "lumps Defendants together" as a single entity, and "then proceeds to make joint allegations regarding all such Defendants, as opposed to particularizing conduct engaged in by each entity named as a defendant." (Doc. No. 13 at 23-24.) Plaintiffs respond that the Amended Complaint sufficiently alleges that "[e]ach of the Defendants was involved in the solicitation and/or sale of the securities" and that "the information and documents necessary to determine the precise involvement of each defendant is particularly within the knowledge and/or possession of the Defendants." (Doc. No. 23 at 21-22; Am. Compl. ¶ 21.) Plaintiffs further respond that paragraphs 46 through 62 of the Amended Complaint "very specifically allege the misstatements and omissions made by individuals acting as agents of Defendants." (*See* Doc. No. 23 at 22.)

Defendants correctly state the controlling law. "The PSLRA requires [Plaintiffs] to specify the role of each defendant, demonstrating each Defendant's involvement in misstatements and omissions." *Winer Family Trust v. Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007). We agree that the Amended Complaint often lumps Defendants together and makes vague allegations of "Defendants'" conduct. Plaintiffs allege that in August 2005, Tomao made various misrepresentations in the deal tape and other materials that he gave to Plaintiffs' CEO, Moore. (Am. Compl. ¶ 46.) Plaintiffs allege that Tomao was a salesperson in "Merrill's" San Francisco office. "Merrill" is defined in the Amended Complaint to include Defendant Merrill

---

Nevertheless, the Amended Complaint does not contain sufficient factual allegations to meet this burden.

Lynch and six of Merrill Lynch's subsidiaries and related entities.  (*See id.* ¶¶ 21, 46.)

We reject Plaintiffs' broad and unsupported assertion that paragraphs 46 through 62 of the Amended Complaint allege misstatements and omissions "made by *individuals* acting as agent of [the various] Defendants" when Tomao is the only individual mentioned.  (Doc. No. 23 at 22) (emphasis added).  We also reject Plaintiffs' assertion that they can avoid alleging the role of each defendant with particularity until after discovery allows them to identify a proper defendant.  *See Glover v. Deluca*, No. 03-0288, 2006 WL 2850448, at *8 (W.D. Pa. Sept. 29, 2006) (finding that allegations against each defendant were not particularized where the plaintiff "advanced the same generalized allegations against 'Defendants' as a group, rarely mentioning them by name").  As the Seventh Circuit has explained, "the purpose for the heightened pleading requirement in fraud cases was 'to force the plaintiff to do more than the usual investigation before filing his complaint.'"  *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (Posner, J.) (citations omitted).  "Greater precomplaint investigation is warranted in fraud cases," the court held, "because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)."  *Id.*   Thus, plaintiffs alleging securities fraud must "differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud."  *Swarts v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (citation omitted); *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) (noting that in the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, "identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme"); *Silva Run Worldwide, Ltd., v. Gaming Lottery Corp.*, No. 96-3231, 1998 WL 167330, at *11 (S.D.N.Y. Apr. 8, 1998) (noting that "[w]hen

fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant"); *Wiener v. Napoli*, 760 F. Supp. 278, 284 (E.D.N.Y. 1991) (holding that where "multiple defendants are involved in the alleged fraud, it is especially important that the fraud be particularized as to each one of them.").

We recognize that Plaintiffs have not had the benefit of discovery to probe the contours of the role, if any, of each Defendant.  Even so, Plaintiffs may not bypass the PSLRA merely by alleging that Defendants possess "the information and documents necessary to determine the[ir] precise involvement."  (Am. Compl. ¶ 21.)  It is true that courts have "relaxed the particularity rule when factual information is peculiarly within the defendant's [exclusive] knowledge or control," but the relaxed application of the rule is not "a license for plaintiffs to base fraud claims on speculation and conclusory allegations." *United States ex rel. Staniszewski v. Washington & Jefferson Coll.*, No. 05-1098, 2008 WL 2987213, at *3 (W.D. Pa. July 31, 2008) (citation omitted); *see also In re Lucent Tech., Inc., Sec. Litig.*, 217 F. Supp. 2d 529, 544 (D.N.J. 2002) ("Still, even when relaxed, the Rule 9(b) standard does not tolerate mere boilerplate and conclusory allegations.").  Tomao may very well work for Defendant Merrill Lynch or one of its six subsidiaries.  It is implausible, however, that Tomao works for all of them, and yet Plaintiffs name all of these entities as defendants.  Plaintiffs' allegation is conclusory.  Such a deficiency normally could be addressed in an amended pleading, except that in this case, Plaintiffs' Section 10(b) claim fails for the additional reasons set forth above.

## C.    Section 12(2) of the Securities Act of 1933

Plaintiffs' second claim arises under Section 12(2) of the Securities Act of 1933.  Section 12(2) holds liable any person who

offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission[.]

15 U.S.C. § 77l(a)(2) (West 2008).  "Section 12(2) applies to misrepresentations made in the course of a prospectus or initial offering."  *Ravenna v. Integrated Food Tech. Corp.*, No. 99-0524, 1999 WL 740384, at *2 (E.D. Pa. Sept. 15, 1999) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 566 (1995)).  Section 12(2) does not apply to the private sale of securities.  *See In re Fuwei Films Sec. Litig.*, No. 07-9416, 2009 WL 2005291, at *19 (S.D.N.Y. July 10, 2009) (dismissing Section 12(2) claims because liability "only attaches to plaintiffs who purchased their shares directly in the initial public offering, and not the so-called 'aftermarket'"); *Emergent Capital Inv. Mgmt., LLC, v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 622 (S.D.N.Y. 2001) (dismissing claim under Section 12(2) "since the Stock was sold not by prospectus but by private placement"), *aff'd in part and rev'd in part on other grounds*, 343 F.3d 189 (2d Cir. 2003); *In re Ikon Off. Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 182 (E.D. Pa. 2000) (noting that "Section 12(2) does not apply to secondary market transactions"); *Warden v. Crown Am. Realty Trust*, No. 96-0025, 1998 WL 725946, at *2 (W.D. Pa. Oct. 15, 1998) ("With respect to plaintiffs' claims under Section 12(2), the issue is clear-cut:  unless a plaintiff purchases his shares in the IPO, he cannot assert a claim"), *aff'd*, 229 F.3d 1140 (3d Cir. 2000); *Walish v. Leverage Group, Inc.*, No. 97-5908, 1998 WL 314644, at *5 (E.D. Pa. June 15, 1998) ("*Gustafson* clearly states that Section 12(2) does not apply to private sales of securities.").  Plaintiffs concede that "Section 12(a)(2) applies only to securities sold to the public by means of a misleading prospectus."  (Doc. No. 23

at 48.)

Plaintiffs allege that Section 12(2) applies to the Junior Certificates even though they purchased them from Defendants in a private sale because the Junior Certificates were "issued simultaneously with, and as an integral part of a public offering of the other Certificates which were publicly offered and issued pursuant to, *inter alia*, a Prospectus and Prospectus Supplement dated August 26, 2005." (Am. Compl. ¶ 107.) Plaintiffs "contend[] that in reality, all of the Certificates were part of one public offering." (Doc. No. 23 at 48.) For this proposition, Plaintiffs rely on *Steed Finance LDC v. Nomura Securities International, Inc.*, No. 00-8058, 2001 WL 1111508, at *5 (S.D.N.Y. Sept. 20, 2001). In *Steed*, the defendant issued 27 classes of mortgage-backed securities of varying priorities. *Id.* at *1. The defendant issued higher-priority securities to the public pursuant to a Prospectus and Prospectus Supplement and, at the same time, issued lower-priority securities in a private sale pursuant to a Private Placement Memorandum. *Id.* The plaintiff alleged that it was induced into buying the lower-priority securities through fraudulent and misleading statements or omissions that were knowingly made by the defendants in, *inter alia*, the Prospectus, Prospectus Supplement, and Private Placement Memorandum. *Id.* The Prospectus Supplement offered only the higher-priority public securities and clearly referred to the lower-priority securities as "Not Offered Hereby." *Id.* The court denied the defendant's motion to dismiss a claim under Section 12(2), finding that "whether the alleged simultaneous public and private offerings may be considered a single integrated offering is . . . unsuitable for resolution at this stage." *Id.* at *6.

Defendants contend that since *Steed*, Plaintiffs' "theory that a private offering can be subject to Section 12(a)(2) where it was conducted 'simultaneously with' and 'as an integral part'

of a public offering has been repeatedly rejected as a matter of law." (Doc. No. 13 at 36.)

Defendants cite to a 2005 decision from the Court of Appeals for the Second Circuit, *Yung v.*

*Lee*, 432 F.3d 142, 145 (2d Cir. 2005).[13]  In *Yung*, the plaintiffs purchased securities from the

defendants in a private sale in reliance on a prospectus that the defendants prepared for a public

offering. *Id.* at 144.  The defendants "relied heavily" on the Prospectus in their marketing of the

securities. *Id.* at 149.  The court affirmed the dismissal of the plaintiffs' Section 12(a)(2) action,

holding that "a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires

securities through a private transaction, whether primary or secondary." *Id.* (citing *Gustafson*,

513 U.S. at 584).  The court reasoned that "[a] private offering is not effected 'by means of a

prospectus' because . . . Section 12(a)(2) liability cannot attach unless there is an 'obligation to

distribute a prospectus,' and there is no 'obligation' to distribute a document that describes a

public offering to a private purchaser." *Id.* at 148 (quoting *Gustafson*, 513 U.S. at 571).  Since

the Second Circuit announced the *Yung* decision in 2005, courts have repeatedly dismissed

actions under Section 12(a)(2) when the plaintiffs relied on a prospectus that the defendants were

under no obligation to distribute. *See, e.g.*, *Gotham Holdings, LP, v. Health Grades, Inc.*, 534 F.

Supp. 2d 442, 445 (S.D.N.Y. 2008) (granting motion to dismiss action under Section 12(a)(2)

where the plaintiffs "have not alleged that [the defendant] was under any obligation to issue a

prospectus for the sales at issue," and finding it "irrelevant" that a "prospectus was included in

the sales offering documents made available to purchasers" in a private sale); *In re Refco, Inc.,*

*Sec. Litig.*, 503 F. Supp. 2d 611, 625 (S.D.N.Y. 2007) (granting motion to dismiss and noting

---

[13] The Court of Appeals for the Third Circuit does not appear to have addressed the issue presented in *Yung*:  whether a defendant can face liability under Section 12(a)(2) in connection with the private sale of securities made at the same time as an initial public offering.

that in *Yung*, "there was no liability" under Section 12(a)(2) "[e]ven where the defendants'

marketing efforts in connection with the private transaction relied heavily upon the same

prospectus used in a public offering, because defendants were not obligated to distribute the

prospectus in connection with that transaction"); *In re Prestige Brands Holding, Inc.*, No. 05-

6924, 2006 WL 2147719, at * 9 (S.D.N.Y. July 10, 2006) (dismissing Section 12(a)(2) claim

brought by plaintiffs who "bought shares 'traceable to' or 'in connection with' an initial public

offering," since the statute "provides for a claim only in favor of those who purchase stock

directly in an initial public offering").

We find persuasive the reasoning of the Second Circuit in *Yung* and conclude that it is

irrelevant that Defendants made available a prospectus describing the mortgage loans underlying

the Junior Certificates.  *See Gotham Holdings,* 534 F. Supp. 2d at 445.  Plaintiffs have not

alleged that Defendants were under any obligation to issue a prospectus for the private sales at

issue.  Thus, Defendants' private sales do not qualify for liability under § 12(a)(2) of the

Securities Act.  Plaintiffs therefore fail to state a claim under Section 12(a)(2) upon which relief

may be granted, and the claim must be dismissed.

### D.    Section 15 of the Securities Act of 1933

Plaintiffs make a claim under Section 15 of the Securities Act of 1933 ("Section 15").

*See* 15 U.S.C. § 77o.  Section 15 creates liability for one who controls a violator of Section 12.

*See id.*  "[C]ontrolling person liability under section 15 of the Securities Act hinges on liability

under either [Section 12]").  *Klein v. Gen. Nutrition Co.*, 186 F.3d 338, 344 (3d Cir. 1999).

Since Plaintiffs fail to state a claim under Section 12 for the reasons already mentioned, Plaintiffs

also fail to state a claim under Section 15 for one who controls a violator of Section 12.  *See*

*Klein*, 186 F.3d at 344 (dismissing Section 15 claim where the plaintiffs "failed to allege

sufficient facts to support a finding of liability under either § 77k or § 77l").

### E.        Section 20 of the Securities Exchange Act of 1934

Plaintiffs' last federal claim arises under Section 20 of the Securities Exchange Act of

1934 ("Section 20").  *See* 15 U.S.C. § 78t.  "Section 20(a) imposes joint and several liability on

any person who 'controls a person liable under any provision of the [Exchange Act].'"  *In re*

*Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) (quoting *Shapiro v. UJB Fin. Corp.*, 964

F.2d 272, 279 (3d Cir. 1992)).  "If no controlled person is liable, there can be no controlling

person liability."  *Id.*   Since Plaintiffs fail to state a claim under the Exchange Act for the reasons

discussed above, Plaintiffs also fail to state a claim under Section 20.  *See, e.g.*, *In re Adolor*

*Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 576 (E.D. Pa. 2009) (dismissing Section 20(a) claims

where the plaintiff failed to establish a violation of Rule 10b-5); *Lieberman v. Cambridge*

*Partners, LLC*, No. 03-2317, 2004 WL 1396750, at *3 (E.D. Pa. Jun. 21, 2004) (dismissing

claim under Section 20 as "derivative of [the plaintiff's] claims under section 10(b) and Rule

10b-5"), *aff'd*, 432 F.3d 482 (3d Cir. 2005).

### F.        State Law Claims

Defendants have also moved to dismiss Plaintiffs' seven state law claims for fraud,

negligent misrepresentation, innocent misrepresentation, breach of contract, rescission, and

violations of the Pennsylvania Securities Act of 1972 and the California Corporate Securities

Law of 1968.  Plaintiffs' federal claims have been dismissed.  Our jurisdiction is based on the

federal question presented in those claims.  When a district court dismisses all claims over which

it has original jurisdiction, it "may decline to exercise supplemental jurisdiction" over a related

state law claim.  28 U.S.C. § 1367(c)(3).  The Third Circuit has held that, where all federal claims are dismissed before trial, "the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (citing *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).

The cases are clear that when all of the federal claims are dismissed at an early stage, the district court should decline the exercise of supplemental jurisdiction over the state claims absent extraordinary circumstances.  *See Bright v. Westmoreland County*, 380 F.3d 729, 751 (3d Cir. 2004) ("[A]bsent extraordinary circumstances, where the federal causes of action are dismissed the district court should . . . refrain from exercising [supplemental] jurisdiction."); *Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) ("We have held that pendent jurisdiction should be declined where the federal claims are no longer viable, absent 'extraordinary circumstances.'") (citation omitted); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir. 1976) (noting that "the court should ordinarily refrain from exercising [supplemental] jurisdiction in the absence of extraordinary circumstances").  This case does not present extraordinary circumstances.  No scheduling order has been issued by the Court.  There is no trial date, and no lengthy motion practice has occurred.  Judicial economy and convenience to the parties therefore do not weigh in favor of retaining supplemental jurisdiction, and comity favors allowing the appropriate state court to hear the state law claims in this matter.  Accordingly, Plaintiffs' state law claims will be dismissed.

**IV.**   **CONCLUSION**

For these reasons, the Amended Complaint will be dismissed.

An appropriate Order will follow.

BY THE COURT:

_____
R. Barclay Surrick, J.